PER CURIAM.
 

 James Phillip Barnes appeals from a judgment of conviction of first-degree murder and a sentence of death, as well as convictions for burglary of a dwelling with an assault or battery, two counts of sexual battery by use or threat of a deadly weapon, and arson of a dwelling. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the convictions and sentence of death.
 

 BACKGROUND
 

 James Phillip Barnes was convicted on December 13, 2007, of the murder of Patricia “Patsy” Miller, a nurse, who was killed in her condominium in Melbourne, Florida, on April 20, 1988. Although Barnes was a suspect at the time of the Miller murder, he was not charged until after he wrote several letters to an assistant state attorney in 2005 and confessed in a recorded interview, which Barnes arranged and in which he was questioned by another inmate about the Miller murder. Even though DNA testing performed in 1997 linked him to the crimes committed against Miller, Barnes was not indicted until April 18, 2006. The indictment charged first-degree murder of Miller, as well as burglary of a dwelling with an assault or battery, sexual battery by use or threat of a deadly weapon (vaginal sexual battery), sexual battery by use or threat of a deadly weapon (anal sexual battery), and arson of a dwelling. At the time of the indictment, Barnes was already serving a life sentence for the first-degree murder of his wife, Linda Barnes, which occurred in 1997.
 

 Barnes immediately sought to waive counsel and was provided a full Faretta
 
 [1]
 
 hearing. Thereafter, he represented himself throughout the proceedings with
 
 *1014
 
 standby counsel available at all times. On May 2, 2006, Barnes entered an open plea of guilty and waived a sentencing jury and, on May 11, 2006, the trial court ordered a presentence investigation report to be prepared. The court also ordered Barnes’ school records and appointed Dr. William Riebsame, a board-certified forensic psychologist, to provide a psychological evaluation of Barnes.
 

 After the State’s presentation of evidence of aggravation at the penalty-phase
 
 Spencer
 

 [2]
 

 hearing on January 22-26, 2007, Barnes refused to present any evidence of mitigation and announced that he would rely only on the fact that he came forward and took responsibility for the murder. Over Barnes’ objection, the court appointed special mitigation counsel to investigate and present any other mitigation at the mitigation portion of the
 
 Spencer
 
 hearing held November 16, 2007. The court entered the sentencing order on December 13, 2007, finding that the six aggravating factors
 
 [3]
 
 outweighed the one statutory mit-igator
 
 [4]
 
 and nine nonstatutory mitigators,
 
 [5]
 
 and imposed a sentence of death for the murder, life sentences for each of the burglary with battery and the sexual battery counts, and thirty years for the arson. Barnes raises two issues on appeal— whether the trial court violated Barnes’ Sixth Amendment right to represent himself when it appointed special court counsel to develop penalty-phase mitigation and whether the court reversibly erred in considering a presentence investigation report over Barnes’ objection that it contravened his constitutional right to confront witnesses against him. In addition, the Court has a mandatory duty to examine the sufficiency of the evidence or, in this case, the knowing, intelligent, and voluntary nature of Barnes’ plea,
 
 [6]
 
 and to determine whether
 
 *1015
 
 the death sentence is proportionate. We turn first to a discussion of the facts and procedural history of the case.
 

 FACTS AND PROCEDURAL HISTORY
 

 The Circumstances of the Murder
 

 The facts of the murder, based upon Barnes’ written and taped statements, and as shown in the forensic evidence presented during the penalty phase, are summarized here. On the night of April 20, 1988, Barnes went to Patricia “Patsy” Miller’s condominium unit, located at the River Oaks Condominiums in Melbourne, Brevard County, Florida. He did not know Ms. Miller, although he may have encountered her before at the condominium complex, where he knew several of the residents, or at Satellite Beach. Once he arrived at Miller’s condominium, he took off all his clothes in order not to leave evidence and obtained entry by removing a screen and entering through a bedroom window. Barnes admitted that he went there with the intent to both rape and kill Miller. Once inside, he armed himself with a knife from the kitchen. After surreptitiously watching Miller go about her normal activities for a short period of time, he confronted her in the bathroom and forced her at knife-point to the bedroom where he sexually battered her. He then bound her hands behind her back with shoelaces that he had removed from some tennis shoes, tied her feet together, and sexually battered her again. Barnes admitted that he tried to strangle her to death with a belt which he had removed from her terrycloth robe but was not successful, so he then bludgeoned the back of her head with a hammer that he found in her bedroom.
 

 Barnes confessed that he took a bank card from her wallet but could not later make it work at an ATM. He also collected everything he touched in Miller’s residence, as well as the clothing Miller was wearing, and placed them in a bag. Barnes then set fire to the bed where Miller’s body lay in order to eliminate forensic evidence left there. Before leaving in his car, Barnes took all the items that he had bagged, as well as the window screen that he had removed, and left to dispose of the items at another location.
 

 Shortly after 11 p.m., firefighters responded to a fire alarm at the condominium complex and found Miller’s charred body face down on the bed in her master bedroom, with her hands bound behind her back with shoelaces. There were varying degrees of burns over her body. The Medical Examiner testified that the cause of death was blunt-force trauma from multiple blows to Miller’s head consistent with being beaten with a hammer. Signs of attempted strangulation, including a fractured hyoid bone, which the doctor testified would have taken a great deal of force to accomplish, were also discovered in the autopsy. The Medical Examiner determined that Miller’s body was set ablaze after she died from the multiple blows to her head. Even though Barnes attempted to destroy forensic evidence by setting the bed ablaze, sperm was recovered from Miller and was preserved for DNA testing.
 

 Within one week of the murder, the police considered Barnes as a suspect and he was questioned by Sergeant Dennis Nichols of the Melbourne Police Department. At that time, Barnes denied any involvement with the murder and told Sergeant Nichols that he had never been in
 
 *1016
 
 side Ms. Miller’s apartment. He also denied knowing Miller, although he indicated he may have seen her once in Satellite Beach. Barnes agreed to give a sample of his blood for possible DNA comparison, but in 1988 the available method of DNA testing was inadequate to produce a match and the case remained unsolved.
 

 In 1998, Barnes was serving a life sentence for the 1997 first-degree strangulation murder of his wife, Linda Barnes. With advanced techniques for DNA testing, specifically the polymerase chain reaction (PCR) test, sperm removed from Miller’s vagina, which was resubmitted for testing in 1997, produced a positive match to Barnes. Subsequently, Sergeant Nichols and Brevard Sheriffs Office Lieutenant Todd Goodyear traveled to the prison to speak with Barnes about the murder, but he refused to speak to them. For unspecified reasons, charges were not filed against Barnes for the Miller murder.
 

 In 2005, while Barnes was still incarcerated on his life sentence for murdering his wife, he wrote three letters to Assistant State Attorney Michael Hunt, a prosecutor who was involved in the case concerning the death of Barnes’ wife. The letters to Hunt were dated October 10, 2005, December 7, 2005, and December 21, 2005. In the October 10, 2005, letter, Barnes requested that an interview be held at the correctional facility, with fellow inmate Sherman Insco asking Barnes questions about the Miller case, while law enforcement officers videotaped the interview.
 

 The interview occurred on November 1, 2005. In that videotaped interview, Barnes admitted to the foregoing facts of the burglary, sexual batteries, murder, and arson. He explained how he entered the condominium unit through a bedroom window and said he was in the condominium for approximately forty-five minutes to one hour. During his interview, Barnes described with accuracy Miller’s physical appearance, the interior of the apartment, and specific objects he saw in the apartment, including a bicycle, basket-weaving supplies, divorce paperwork, a stethoscope, and oversized curtains. Further, his descriptions of the homicide, the sexual batteries, and the arson were consistent with the evidence gathered by police.
 

 Faretta
 
 Hearing and Guilt Phase Proceedings
 

 Shortly after Barnes’ indictment, he filed a pro se request for speedy trial and asserted a waiver of counsel. Barnes, age forty-four at the time of the hearing, appeared before Judge Lisa Davidson on May 2, 2006, with an assistant public defender as standby counsel. Barnes again stated his desire to waive counsel and represent himself. Pursuant to his request, the trial court conducted an extensive
 
 Far-etta
 
 hearing during which the judge explained the indictment to Barnes and informed him of the maximum penalties for each count, including the fact that the first-degree murder count carried the maximum penalty of death and that the State was seeking the death penalty. Barnes was advised of his right to have an attorney appointed to represent him if he could not afford one. When asked about his education, Barnes testified that he completed thirteen years of school, and said he was “a certified law clerk,” with that designation given by the Department of Corrections, and that he had worked for some years in the prison librazy. Barnes confirmed that he was mentally alert and had not taken any pills, drags or alcohol within the last twenty-four hours.
 

 When asked if he had ever suffered from a mental disorder, defect, disease, or derangement, he answered, “No.” Wizen asked if he was ever told that he had any type of mental illness, he said:
 

 
 *1017
 
 No, ma'am. I’m borderline personality disorder based on somebody’s, you know, matrix.
 

 I’ve read the diagnostic and statistical manual. I — -I don’t believe that there’s any reason to think that I don’t have the cognitive ability to understand what’s going on right now, ma'am.
 

 Barnes also confirmed that he knew there may be defenses available to him and that experienced attorneys could assist him. Barnes continued to maintain that he wanted to represent himself and that he knew the pitfalls of self-representation. Barnes was informed that at every stage of the proceedings standby counsel would be there to assist if he so desired. The trial court found on the record that the requirements of Florida Rule of Criminal Procedure 3.111
 
 [7]
 
 had been met and that Barnes was “extremely competent” and had made an unequivocal request, knowingly, freely and voluntarily, to waive counsel and represent himself. The court also found that Barnes fully understood the advantages and disadvantages of representing himself.
 

 In this same May 2, 2006, hearing, Barnes proffered his open plea of guilty to the murder of Patricia Miller and to the other charged offenses. Prior to acceptance of the plea by the court, the State presented a factual basis for the plea, stating that the evidence would show Miller was killed by blunt-force trauma to the head, and was also strangled, in Brevard County, Florida, on April 20, 1988. The prosecutor proffered that the evidence would show she was sexually battered both anally and vaginally, and that testing of sperm left in her body was substantially consistent with Barnes’ DNA profile. The prosecutor also advised the court that Barnes’ November 1, 2005, videotaped statement, as well as correspondence from Bames to the prosecutor, “detailed specifically and graphically the events of April 20,1998, pertaining to the murder of Patricia Miller, the rape and arson as well as burglary.” Barnes was then asked to state his own factual basis for the plea, after being advised that anything he said would be used against him and that he had a Fifth Amendment right to remain silent. Barnes stated that he broke into Patricia Miller’s condominium, raped her twice, tried to strangle her to death, and hit her in the head with a hammer and killed her. He further stated that he set the bed on fire.
 

 Before accepting the plea, the court confirmed that Barnes was able to read, write and speak English; that no one had forced or threatened him into pleading guilty; and that no one had promised him anything to induce him to enter a plea. He was advised of the rights he would be giving up if he entered a plea, including the right to a jury trial where the State would be required to prove every element of each offense beyond a reasonable doubt; the right to appointed counsel at trial; the right to confront his accusers and to cross-examine witnesses; the right to present defenses; the right to remain silent or to testify; and the right to appeal all matters relating to judgment and sentence. Barnes confirmed that he understood all the rights that he would be giving up by
 
 *1018
 
 entering guilty pleas, and confirmed that he was entering the pleas because he felt it was in his best interest. Finally, Barnes again confirmed that he understood he would be facing a sentence of life in prison or death for the charge of murder.
 

 The trial court found that there was a factual basis for the pleas and that Barnes had voluntarily and intelligently waived his right to a jury trial and all the rights associated with it by entry of his plea to each charge. The court then accepted Barnes’ guilty pleas and adjudged him guilty of the offenses. Standby counsel, who had been appointed at the outset of the proceedings, was present with Barnes at each subsequent stage of the proceedings, and the court continued to offer Barnes counsel at each critical stage. The case then proceeded to the penalty phase.
 

 Penalty Phase Proceedings
 

 Prior to the penalty-phase evidentiary hearing, Barnes announced that he wanted to waive a sentencing jury. The court apprised him of the nature of the sentencing phase, the importance of aggravators and mitigators, the important role that an advisory jury fills, and the fact that he could challenge aggravators and present his own mitigation for consideration by the jury. Barnes indicated that he still wanted to waive the sentencing jury. The judge offered him counsel, which he again rejected, and found that Barnes knowingly and intelligently waived an advisory jury. Barnes informed the judge that he did not plan to present any witnesses or evidence in mitigation, and the judge announced that she proposed to appoint special court counsel to investigate and present mitigating evidence. Barnes objected and said he had his own mitigation strategy in mind, which he wanted to follow.
 

 A penalty-phase
 
 Spencer
 
 evidentiary hearing was commenced on January 22, 2007. Barnes was joresent with standby counsel. He refused a renewed offer of appointed counsel and, after another full
 
 Fareita
 
 hearing, the court allowed Barnes to continue to represent himself. The State presented Melbourne police detective Lieutenant Dennis Nichols, who testified that when he entered Miller’s condominium apartment on April 20, 1988, he found the charred remains of Miller nude on the bed, with her hands tied behind her back with shoelaces. Photographs were also admitted showing a stethoscope hanging on the door in Miller’s room and basket weaving supplies, as Barnes had described in his statement.
 

 Assistant State Attorney Michael Hunt was called to testify concerning the series of letters that Barnes wrote to him about the Miller murder. The October 10, 2005, letter was read into evidence, in which Barnes said that inmate Sherman Insco had persuaded him, as a converted Muslim, to confess to the unsolved crime during Ramadan. In the letter, Barnes offered to give a videotaped interview but only if the interview was conducted by Sherman Insco.
 
 [8]
 
 The November 1, 2005, videotaped interview of Barnes by Insco was played for the court as part of the State’s presentation of aggravating factors.
 

 The State also presented the testimony of the Medical Examiner that the cause of death was blunt-force trauma from multi-
 
 *1019
 
 pie blows to Miller’s head consistent with being beaten with a hammer. Barnes’ confession letter explained that he struck the back of her head several times with the metal end of the hammer, then struck her fractured skull several more times with the wooden end of the hammer to attempt to conceal the identity of the murder weapon. The evidence also showed that Barnes first attempted to strangle Miller and that she was set on fire after her death.
 

 Dale Gilmore, DNA supervisor of the Wuestoff Reference Laboratories, testified that the DNA testing done in 1988 was by the restriction fragment length polymorphism (RFLP) method, which required a large DNA sample. He testified that a semen sample taken from Miller was retested in 1997 using the PCR method, which requires only a small sample. The 1997 DNA testing could not exclude Barnes and, Gilmore testified, only DNA from one in 28.7 million African Americans or one in 3.8 million Caucasians would produce the same result.
 

 Finally the State presented a victim impact statement, which was read by the victim advocate. The victim impact statement of Paula Murphy, Miller’s sister, indicated that Miller was a nurse who loved to backpack, ride horses, hike with her dog, sld, canoe and bird watch. She was generous and active with the Salvation Army domestic abuse program in Brevard County. Miller was the second of ten children in a close-knit family, which will miss her immeasurably.
 

 At the conclusion of the State’s case in the
 
 Spencer
 
 hearing, Barnes announced that he planned to present no mitigation witnesses or evidence. The judge again offered Barnes appointed counsel and when he declined, inquired of standby counsel what mitigation investigation he would make if he were representing Barnes. Standby counsel advised the court that he would gather all school and medical records, as well as records of every mental health expert who had seen Barnes, and would interview anyone he could locate who had substantial contact with Barnes during his life. When the trial court announced it would appoint special mitigation counsel to investigate and present mitigation, Barnes objected and argued that his strategy had been to facilitate final resolution of the case by confessing to the unsolved crimes and taking responsibility, in order to “clean the slate” and give final resolution to the victim’s family. Barnes also reminded the trial judge that she had a presentence investigation report, doctor’s report, and school records, which she had earlier ordered. Several days later, the court appointed special mitigation counsel, Sam Bardwell, to assist the court by investigating and presenting mitigation.
 

 The mitigation portion of the
 
 Spencer
 
 evidentiary hearing took place on November 16, 2007. Barnes was again offered appointed counsel and given a full
 
 Faretta
 
 inquiry when he reiterated his desire to represent himself. Special mitigation counsel Sam Bardwell then presented the testimony of Dr. Riebsame, a forensic psychologist. Dr. Riebsame testified that he first attempted to evaluate Barnes after the court appointed him in 2006, but was unable to provide any actual diagnosis of Barnes’ mental condition due to lack of cooperation by him. Dr. Riebsame was again asked to evaluate Barnes for purposes of the mitigation hearing and was provided materials to review, including the police report, medical examiner report, fire investigation report, DNA lab reports, witness statements, criminal records, Barnes’ medical records from the Department of Corrections, intelligence test reports, Minnesota Multiphasic Personality Inventory test results from past testing, a pre-
 
 *1020
 
 sentence investigation report, and a mitigation report prepared for Bardwell by investigator Terry Sirois. Sirois had interviewed several of Barnes’ family members to document the conditions of his early life.
 

 Based on his review of the materials, including information about Barnes’ childhood, Dr. Riebsame found that Barnes met the definition of a psychopath, in that his history showed him to be frequently in trouble with the law, deceptive, manipulative and reckless in behavior that is often dangerous to others. Dr. Riebsame testified that in a psychopathic individual, similar to what he observed in Barnes’ records, there is a history of antisocial behavior and lack of conscience, lack of empathy, shallow appearance of feeling, grandiosity, predatory behavior, and typically above-average intelligence. After reviewing all the materials provided to him, his impression was that Barnes suffered from behavioral and emotional problems from an early age.
 
 [9]
 
 He also concluded that, at the time of offense, Barnes was under the emotional or mental disturbance of cocaine dependency, antisocial personality disorder and a personality disorder NOS (not otherwise specified) that would include borderline narcissistic characteristics. It was primarily this testimony upon which the trial court relied in finding the statutory mitigator that Barnes was under the influence of extreme mental or emotional disturbance at the time of the crime.
 

 After Dr. Riebsame’s testimony, which concluded mitigation counsel’s presentation, Barnes did not offer any witnesses or evidence and advised the court that he would not submit a sentencing memorandum. We now turn to our discussion of the issues in this appeal. Our mandatory review of the sufficiency of the basis of the first-degree murder conviction will be discussed first.
 

 ANALYSIS
 

 Knowing, Intelligent and Voluntary Nature of the Plea
 

 Barnes does not challenge his conviction for first-degree murder in this appeal, nor does he challenge the acceptance of his guilty plea. Nevertheless, this Court has a mandatory obligation to review the basis of Barnes’ conviction for first-degree murder. Where guilt is found after a trial, the Court has a mandatory obligation to review the sufficiency of the evidence to support the conviction.
 
 See Bevel v. State,
 
 983 So.2d 505, 516 (Fla.2008).
 
 [10]
 
 In this case, Barnes was convicted after waiving his right to counsel and, after a
 
 Faretta
 
 hearing, was allowed to represent himself. He then entered an open plea of guilty to first-degree murder. Under these circumstances, “this Court’s [mandatory] review shifts to the knowing, intelligent, and voluntary nature of that plea.”
 
 Tanzi v. State,
 
 964 So.2d 106, 121 (Fla.2007) (quoting
 
 Winkles v. State,
 
 894 So.2d 842, 847 (Fla.2005));
 
 see also Guardado v. State,
 
 965 So.2d 108, 118 (Fla.2007);
 
 Lynch v. State,
 
 841 So.2d 362, 375 (Fla.2003);
 
 Ocha v. State,
 
 826 So.2d 956, 965 (Fla.2002). In such a review, this Court will “scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of
 
 *1021
 
 the constitutional rights he was waiving, and pled guilty voluntarily.”
 
 Winkles,
 
 894 So.2d at 847 (quoting
 
 Ocha,
 
 826 So.2d at 965).
 

 In the present case, Barnes filed a written waiver of counsel on May 1, 2006. On May 2, 2006, the trial court conducted an extensive
 
 Faretta
 
 hearing during which the judge explained the indictment counts to Barnes and informed him of the maximum penalties for each, including the fact that the first-degree murder count carried the maximum penalty of death and that the State was seeking the death penalty. Barnes was advised of his right to have an attorney appointed to represent him if he could not afford one.
 

 Barnes testified that he also understood he was facing a possible death sentence and that there were a number of defenses that might be available to him. He said that even so, he wanted to represent himself. Barnes explained:
 

 I’m invoking my Sixth Amendment right to assistance of counsel. I choose to defend myself.
 

 [[Image here]]
 

 The United States Constitution has inalienable rights. And one of them is that I have the right to assistance of counsel. I would also like to make sure I have the right to represent myself.
 

 And that’s the other side of the coin. I don’t have many rights left in this world. That’s one I have. So ... I wish to use that right.
 

 Barnes explained that he understood the pitfalls of representing himself and confirmed that no promises or threats had been made in order to induce him to represent himself. The court found on the record that the requirements of Florida Rule of Criminal Procedure 3.111 had been met and that Barnes’ request to represent himself was made knowingly, freely and voluntarily.
 
 [11]
 

 In this same May 2, 2006, hearing, Barnes was then allowed to proffer his open plea of guilty to the murder of Patricia Miller and to the other charged offenses. Prior to acceptance of the plea, the trial court allowed the State to present a factual basis for the plea, which the prosecutor did, stating essentially that Patricia Miller was killed by blunt-force trauma to the head, and was also strangled, in Brevard County, Florida, on April 20, 1988. Evidence showed she was sexually battered vaginally and anally and that she had sperm in her vagina, which DNA testing linked to Barnes. The prosecutor advised the court that the evidence would show Barnes entered Miller’s residence where he committed the sexual batteries, attempted to strangle her, and committed blunt force trauma on her, resulting in her death. He then set fire to the bedding and her body. The prosecutor advised the court that the evidence included a videotaped statement that Barnes made November 1, 2005, and the letter from Barnes to the prosecutor, in which Barnes detailed the April 20, 1988, murder of Patricia Miller, as well as the rapes, arson, and burglary. The court then asked Barnes to give his own factual basis for the plea, and advised him that anything he said could
 
 *1022
 
 and would be used against him and that he had a Fifth Amendment right to remain silent. Barnes stated:
 

 On April 20, 1988 I broke into Patricia Miller’s condominium on Roosevelt Avenue in Melbourne, Florida. I raped her twice. I tried to strangle her to death. I hit her in the head with a hammer and killed her and I set the bed on fire.
 

 The trial judge determined that Barnes understood the nature of the charges, the mandatory minimum and maximum possible penalties, the right to appointed counsel, the right to be tried by a jury and compel attendance of witnesses, the right to confront and cross-examine witnesses, the right to testify or remain silent, the right to a direct appeal of all matters relating to the judgment, and the fact that if he answered any questions about the crime, the answers could be later used against him. Barnes was told that the possible sentences he could receive for the murder were life in prison or death.
 
 See
 
 Fla. R.Crim. P. 3.172(c)(l)-(6). Barnes clearly acknowledged his guilt, and also stated that he believed entry of the plea was in his best interest.
 
 See
 
 Fla. R.Crim. P. 3.172(e).
 

 Based on the plea colloquy, the trial court found that Barnes was alert, competent, intelligent, and definite about wanting to enter a plea. The court also found that there was a factual basis for the plea to each of the counts and that Barnes made a knowing, intelligent waiver of his right to a jury trial and all the rights associated with it. Accordingly, the trial court accepted Barnes’ guilty pleas and adjudged him guilty of the offenses, including first-degree murder. Thus, the plea colloquy fulfilled the requirements of Florida Rule of Criminal Procedure 3.172, which requires that “[bjefore accepting a plea of guilty or nolo contendere, the trial judge shall determine if the plea is voluntarily entered and that a factual basis for the plea exists.” Fla. R.Crim. P. 3.172(a).
 

 We conclude that Barnes’ plea in this case was knowing, intelligent, and voluntary, and that he “was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.”
 
 Ocha,
 
 826 So.2d at 965. Therefore, the plea and conviction were properly entered. Further, the factual basis for the plea given by the State, which was confirmed by Barnes and amply proven by the forensic evidence, as well as Barnes’ confessions, demonstrates that there was competent, substantial evidence to support the conviction for first-degree murder, as well as the other convictions in this case.
 

 We ton now to the two specific issues that Barnes raises in this appeal, first examining whether the trial court violated his Sixth Amendment
 
 [12]
 
 right to represent himself when it appointed special court counsel to develop penalty-phase mitigation. We then discuss whether the court reversibly erred in considering a presen-tence investigation report over Barnes’ objection that it contravened his constitutional right to confront witnesses against him.
 

 Appointment of Special Mitigation Counsel
 

 Barnes contends that the trial court violated his
 
 Faretta
 
 right to self-representation by appointing special coui’t counsel to investigate and present mitigation over his objection. He argues that as both the client and the attorney, he had the absolute right to limit the court’s consideration of mitigation only to the fact that he came forward to confess to an unsolved crime and took full responsibility for his actions. He also argues that even
 
 *1023
 
 if he did waive mitigation, the trial court violated the procedure set forth in
 
 Muhammad v. State,
 
 782 So.2d 343 (Fla.2001), by appointing mitigation counsel before ordering and reviewing a presen-tence investigation report (PSI), and before determining, based on the PSI, that additional mitigation existed and should be investigated. We disagree with these contentions. In
 
 Muhammad,
 
 we held that where a defendant waives presentation of mitigation, the trial court must order a PSI. We stated that in addition to ordering the PSI:
 

 [T]he trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records. Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses.... If the trial court prefers that counsel present mitigation rather than calling its own witnesses, the trial court possesses the discretion to appoint counsel to present the mitigation as was done in
 
 Klokoc v. State,
 
 589 So.2d 219 (Fla.1991), or to utilize standby counsel for this limited purpose.
 

 Id.
 
 at 363-64 (footnotes omitted).
 

 Muhammad
 
 does not set forth a hard and fast rule that a trial court has no discretion to order investigation and presentation of mitigation without fust reviewing a PSI and without fust making an express determination that the PSI suggests the existence of mitigation. Moreover, in this case, just as we held to be proper in
 
 Muhammad,
 
 the trial judge did have a PSI and had ordered medical and school records before appointing mitigation counsel. Prior to the February 7, 2007, appointment of Sam Bardwell as special mitigation counsel, the court had been provided with a PSI and was aware of an August 22, 2006, report prepared by Dr. Riebsame, which indicated that Barnes had behavioral problems during childhood and was under an extreme mental disturbance at the time of the murder. Just as we held in
 
 Muhammad,
 
 the trial court had discretion to provide a method whereby the possible mitigation was investigated and presented after Bames refused to present any witnesses or evidence of mitigation. Accordingly, we find the trial court acted properly in this regard in appointing independent court counsel, who did not represent Barnes but was directed to assist the court by investigating and presenting mitigation.
 

 We are aware that the Fifth Circuit Court of Appeals has found that appointment of special mitigation counsel under certain circumstances can violate a defendant’s right to represent himself in
 
 United States v. Davis,
 
 285 F.3d 378 (5th Cir.),
 
 cert. denied,
 
 537 U.S. 1066, 123 S.Ct. 618, 154 L.Ed.2d 555 (2002). In
 
 Davis,
 
 the pro se defendant contended that he wanted to continue to assert his innocence as mitigation in the penalty phase, but the trial court appointed special counsel to develop other mitigation for consideration by the court. The court found this appointment to be error under the circumstances, where the mitigation presented by special counsel directly contradicted the defendant’s mitigation. The Court in
 
 Davis
 
 stated:
 

 We find that the district court’s decision to appoint an independent counsel violates Davis’s Sixth Amendment right to self-representation. An individual’s constitutional right to represent himself is one of great weight and considerable importance in our criminal justice system. This right certainly outweighs an individual judge’s limited discretion to
 
 *1024
 
 appoint amicus counsel
 
 token that appointment will yield a presentation to the jury that directly contradicts the approach undertaken by the defend,ant.
 

 285 F.3d at 381 (emphasis added). The Court of Appeals further explained:
 

 As such,
 
 Davis’s strategy is in direct conflict with the independent counsel’s approach.
 
 Because Davis’s right to self-representation encompasses the right to direct trial strategy, the district court’s decision to impose an independent counsel into these proceedings is overturned.
 

 285 F.3d at 385 (emphasis added).
 
 Davis
 
 is distinguished from the instant case because, contrary to what occurred in
 
 Davis,
 
 Barnes presented no mitigating testimony or evidence. Although he contends that he had a mitigation strategy — the fact that he took responsibility for the murder — we conclude that this amounted to nothing more than the fact of his guilty plea. While presentation of evidence of remorse could constitute mitigation evidence, Barnes never offered remorse as an element of his mitigation strategy. He explained that his confession and guilty plea were prompted by his conversion to the Muslim religion and his desire to have the benefit of doing a good deed during Ramadan. Thus, we conclude that, contrary to what occurred in
 
 Davis,
 
 the mitigation evidence presented by independent counsel in this case did not conflict with anything presented by Barnes and did not violate his right to self-representation.
 

 Davis
 
 is further distinguished from the instant case by the fact that in
 
 Davis,
 
 a sentencing jury was present and the court expressed concern that presentation of mitigation by an independent counsel in front of a jury might “give[ ] the independent counsel’s presentation an aura of superiority over whatever is presented by the prosecution and the defense.”
 
 Id.
 
 at 381 n. 1. This concern is not present in the instant case because Barnes waived an advisory jury. Moreover, we agree with the Supreme Court of New Jersey in
 
 State v. Reddish,
 
 181 N.J. 553, 859 A.2d 1173 (2004), which refused to adopt the reasoning in Davis, stating:
 

 The Fifth Circuit concluded [in
 
 Davis
 
 ] that because the “core” of a defendant’s
 
 Faretta
 
 right is “his ability to preserve control over the case he chooses to present to the jury,” this right must be honored during the penalty phase “regardless of whether society would benefit from having a different presentation of the evidence.”
 
 Ibid.
 
 We respectfully disagree. In our view, it is difficult to square that conclusion with the Supreme Court’s mandate in
 
 Gregg, supra,
 
 and
 
 Eddings, supra,
 
 that to constitutionally impose a death sentence, the sentencing jury cannot be deprived of an opportunity to make an individualized judgment based on a fair presentation of mitigating evidence.
 

 Id.
 
 at 1204. As the New Jersey court notes, American Bar Association,
 
 Standards for Criminal Justice,
 
 section 6-3.7 (2d ed.1980), states that standby counsel “may call the judge’s attention to matters favorable to the accused.”
 
 Id.
 
 at 604. In this case, special mitigation counsel filled that same role and assisted the court by bringing to the trial court’s attention matters favorable to Barnes.
 

 A plurality of the United States Supreme Court in
 
 Gregg v. Georgia,
 
 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), instructs us that “[tjhere is no question that death as a punishment is unique in its severity and irrevocability.”
 
 Id.
 
 at 187, 96 S.Ct. 2909. Further, as that Court noted,
 

 
 *1025
 
 [T]he concerns expressed in Furman
 
 [13]
 
 that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.
 

 Gregg,
 
 428 U.S. at 195, 96 S.Ct. 2909. We also recognize that the death penalty “is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense.”
 
 Spaziano v. Florida,
 
 468 U.S. 447, 468, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part). Appointment of mitigation counsel in this case, where Barnes essentially refused to provide any mitigation evidence, was intended to provide such a safeguard and thereby ensure that the sentencing judge was apprised of adequate and relevant information upon which she could make a reasoned decision concerning the applicability of the death penalty. This was proper in order to ensure that the severe and irrevocable penalty of death, if imposed, would be justified and not be imposed in an arbitrary or capricious manner.
 

 The Supreme Court in
 
 Eddings v. Oklahoma,
 
 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), reiterated the requirement of individualized sentencing in capital cases that is required by the Eighth and Fourteenth Amendments to the United States Constitution.
 
 See id.
 
 at 105, 102 S.Ct. 869. “The use of mitigation evidence is a product of the requirement of individualized sentencing.”
 
 Kansas v. Marsh,
 
 548 U.S. 163, 174, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006). Thus, in order for a trial court to carry out its duty to give each capital defendant the individualized sentencing that the Constitution requires, the court may appropriately require presentation of mitigation where a pro se defendant such as Barnes essentially refuses to present any evidence of mitigation. Presentation of mitigation in such a case also allows this Court to carry out its obligation to determine if the death sentence is proportionate. We explained in
 
 Muhammad:
 

 In all capital cases, this Court is constitutionally required to “engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases.” This case provides a perfect example of why the defendant’s failure to present mitigating evidence makes it difficult, if not impossible, for this Court to adequately compare the aggravating and mitigating circumstances in this case to those present in other death penalty cases.
 

 782 So.2d at 364-65 (citations omitted) (quoting
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990)).
 

 The Supreme Court in
 
 Indiana v. Edwards,
 
 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), in holding that states can require otherwise competent but severely mentally ill defendants to be represented by counsel, noted that
 
 “Faretta
 
 ... and later cases have made clear that the right of self-representation is not absolute.”
 
 Id.
 
 at 2384. The
 
 Edwards
 
 Court also cited
 
 Martinez v. Court of Appeal of California, Fourth Appellate District,
 
 528 U.S. 152, 120 S.Ct. 684, 145 L.Ed.2d 597
 
 *1026
 
 (2000), for the proposition that “[e]ven at the trial level ... the government’s interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant’s interest in acting as his own lawyer.”
 
 Edwards,
 
 128 S.Ct. at 2387 (quoting
 
 Martinez,
 
 528 U.S. at 162, 120 S.Ct. 684). In
 
 Martinez,
 
 a case involving the participation of standby counsel rather than court counsel, the Supreme Court also noted that “standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not ‘seriously undermin[e]’ the ‘appearance before the jury’ that the defendant is representing himself.”
 
 Martinez,
 
 528 U.S. at 162, 120 S.Ct. 684 (quoting
 
 McKaskle v. Wiggins,
 
 465 U.S. 168, 187, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)).
 

 Because the trial court and this Court each has a constitutional obligation to ensure that Barnes received individualized sentencing and that the death penalty is fairly and constitutionally imposed, Barnes’ right to self-representation was not violated by the appointment of independent counsel under the facts and circumstances present in this case. Mitigation counsel was appointed, not to supplant Barnes as his own counsel, but to assist the court by presenting mitigation evidence where Barnes refused to do so. The mitigation was not in conflict with any evidence presented by Barnes and was not in conflict with his mitigation theory that he confessed and took responsibility. In fact, the trial court did find his confession and acceptance of responsibility to be non-statutory mitigation. Based on the mitigation presented by special counsel, the trial court also found the statutory mitigator that Barnes was under the influence of a mental or emotional disturbance at the time of the offense, as well as nonstatutory mitigation that he had an abusive childhood, lacked a loving relationship with his parents, and was a functional and capable person with a capacity to contribute to society. Even so, after engaging in its constitutionally required weighing process, the trial court concluded that each one of the six aggravators outweighed all the mitigation found by the court.
 

 We decline to hold, as Barnes requests, that a trial court majr never consider other mitigation contained in the record or appoint special mitigation counsel to assist the court, where a pro se defendant’s refusal to present mitigating evidence impedes or prevents the trial court’s exercise of its constitutional duty to provide individualized sentencing. Thus, relief is denied on this claim. We turn next to Barnes’ claim that consideration of the presentence investigation report in this case violated his confrontation rights.
 

 Consideration of the Presentence Investigation Report
 

 Barnes contends that the trial court reversibly erred when it considered the comprehensive presentence investigation report (PSI) over his objection. He asserts that this violated his constitutional confrontation rights as enunciated in
 
 Crawford v.
 
 Washington
 
 [14]
 
 and that the information in the report was more prejudicial than mitigating. Because this claim is not preserved by specific objection below to any statements contained in the PSI that Barnes contends were testimonial hearsay, the claim is procedurally barred and without merit.
 

 
 *1027
 
 Barnes made several general objections to the PSI, arguing that it contained incorrect or prejudicial information and that it contained hearsay. However, Barnes failed to specifically identify for the trial court and specifically object to those portions of the PSI or attached investigative report that he now contends were prejudicial testimonial hearsay in violation of his Sixth Amendment rights.
 
 See
 
 U.S. Const, amend. VI. The trial judge advised Barnes each time he objected to the PSI that she could not make a blanket ruling and that when the time came for consideration of the PSI, “it needs to be presented and you make specific objections.” Barnes never identified for the trial court any specific portions of the PSI or the attached investigative report that he believed were testimonial hearsay in violation of his confrontation rights.
 

 Even if Barnes’ claim were preserved, we would find it to be without merit. First, Barnes had a fair opportunity to rebut or dispute any matters contained in the PSI but did not take the opportunity to do so.
 
 [15]
 
 Second, even if consideration of portions of the PSI was error, the error was harmless beyond a reasonable doubt. Harmless error analysis applies to
 
 Crawford
 
 violations.
 
 See Rodgers v. State,
 
 948 So.2d 655, 665 (Fla.2006) (holding that any possible
 
 Crawford
 
 violation is subject to a harmless error analysis);
 
 Diaz v. State,
 
 945 So.2d 1136, 1153 (Fla.2006) (same). Most of what Barnes now contends was prejudicial testimonial hearsay was not even contained in the PSI report. Several of the examples he cites in his brief — that he had symptoms of antisocial personality disorder, was a psychopath, and lacked conscience or empathy — were addressed in the testimony of Dr. Riebsame, who was subjected to full cross-examination during the
 
 Spencer
 
 sentencing hearing. Other potentially prejudicial information that he cites in his brief and contends came from the PSI was actually contained in a police investigative report from 1988 and in Dr. Riebsame’s written report, neither of which was admitted into evidence or included in the PSI. “[Wjhere the evidence introduced in error was not the only evidence on the issue to which the improper evidence related, the introduction can be harmless.”
 
 Hojan v. State,
 
 3 So.3d 1204, 1210 (Fla.2009),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 741, — L.Ed.2d -, 78 U.S.L.W. 3319 (2009). Moreover, the vast majority of the alleged testimonial hearsay now cited by Barnes was not included in the sentencing order, although that information generally supports the extreme mental disturbance miti-gator that the trial court did find.
 

 As this Court stated in
 
 Rodgers,
 
 “[a]n error is harmless beyond a reasonable doubt when, after considering all the permissible evidence, a court concludes that there is no reasonable possibility that the error contributed to the jury’s recommendation of death.” 948 So.2d at 665. In this case, that same principle applies, and we consider whether there is a reasonable possibility that any error in consider
 
 *1028
 
 ation of the PSI contributed to the trial court’s decision to impose death. In making this determination, the Court will consider both the permissible evidence on which the trial court could have legitimately relied and impermissible evidence which might have possibly contributed to the imposition of a death sentence.
 
 See State v. DiGuilio,
 
 491 So.2d 1129, 1135 (Fla.1986).
 

 In this case, the trial court heard testimony from Dr. Riebsame that Barnes had a history of antisocial behavior, lack of conscience, lack of empathy and predatory behavior. He also testified that Barnes had a psychopathic personality. Dr. Rieb-same reported that Barnes had a history of stealing, aggressiveness and fire-setting. Further, this testimony was presented in support of the statutory mitigator of extreme mental disturbance, which the trial court found in the sentencing order.
 

 In light of the fact that the information complained of by Barnes was either not contained in the PSI or was presented in live testimony subject to cross-examination — and considering the weight of the six uncontested aggravators in this case— there is no basis to find that had the trial court not considered the PSI, Barnes would have received a life sentence. Nor can we conclude that anything contained in the PSI contributed to imposition of the death sentence. Thus, any error is harmless beyond a reasonable doubt. Because the claim is procedurally barred, and because any error would be harmless, relief is denied on this claim.
 
 [16]
 

 PROPORTIONALITY
 

 Barnes does not challenge the proportionality of his death sentence, but this Court reviews the death sentence for proportionality “regardless of whether the issue is raised on appeal.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006); Fla. R.App. P. 9.142(a)(6). The death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996). To determine if the death penalty is proportionate in a given case, we must make a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 England,
 
 940 So.2d at 407-08 (quoting
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003)). In so doing, we consider the totality of the circumstances and compare the case with other similar capital cases.
 
 See Duest v. State,
 
 855 So.2d 33, 47 (Fla.2003). This “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990). Instead, the review is a
 
 “qualitative
 
 review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998).
 

 In making a proportionality analysis, this Court “will not disturb the sentencing judge’s determination as to ‘the relative weight to give to each established mitigator’ where that ruling is ‘supported by competent substantial evidence.’ ”
 
 Blackwood v. State, 777
 
 So.2d 399, 412-13 (Fla.2000) (quoting
 
 Spencer v. State,
 
 691
 
 *1029
 
 So.2d 1062, 1064 (Fla.1996)). As we explain below, we conclude that when compared to similar murders in which similar aggravators and mitigators were found and in which a death sentence was imposed and affirmed, the death sentence in this case is proportionate.
 

 The trial court found six heavily-weighted aggravators, including that the murder was heinous, atrocious or cruel (HAC) and that it was cold, calculated and premeditated (CCP). The finding of HAC applies to murders that are accompanied by “such additional acts as to set the crime apart from the norm of capital felonies — • the conscienceless or pitiless crime which is unnecessarily torturous to the victim.”
 
 Hernandez v. State,
 
 4 So.3d 642, 669 (Fla.) (quoting
 
 State v. Dixon,
 
 283 So.2d 1, 9 (Fla.1973)),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 160, 175 L.Ed.2d 101 (2009). “[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.”
 
 Hernandez,
 
 4 So.3d at 669 (quoting
 
 James v. State,
 
 695 So.2d 1229, 1235 (Fla.1997)).
 

 In this case, the trial court found HAC based on acts perpetrated by Barnes leading up to the murder as well as the method of murder. The trial court noted in the sentencing order that Barnes, who had stripped naked, confronted the victim in her home with a knife and held her at knifepoint for forty-five minutes to an hour. He threatened several times to kill her, painfully raped her both vaginally and anally and forced her to perform oral sex on him. He attempted for up to forty-five seconds to strangle her and then bludgeoned her to death with a hammer. Based on Barnes’ own confession, the victim begged Barnes not to hurt her. The trial court found that Miller would have been under great emotional stress and fear during this extended period of time. Moreover, the trial court noted that any one of the six aggravators would outweigh the total of all the statutory and nonstatu-tory mitigators found by the court.
 

 This case is similar to but less mitigated than
 
 Hoskins v. State,
 
 965 So.2d 1 (Fla.2007), in which the victim was found with her hands bound behind her back after having been kidnapped from her home, raped, beaten and strangled. The trial court in
 
 Hoskins
 
 found three aggravators, including HAC and murder to prevent a lawful arrest, both of which were found in the instant case.
 
 Id.
 
 at 6. The trial court in
 
 Hoskins
 
 found one statutory mitigator and fifteen nonstatutory mitigators. On appeal, this Court found the death sentence proportionate and affirmed.
 
 Id.
 
 at 22. The death sentence was also affirmed in
 
 Overton v. State,
 
 801 So.2d 877 (Fla.2001), where Overton broke into the victims’ apartment, bound and raped the female victim, and then strangled her to death.
 
 [17]
 
 The court in
 
 OveHon
 
 found five aggravators, which were also found in the instant case — HAC, CCP, prior violent felony, murder during commission of a sexual battery and burglary, and to avoid arrest.
 
 Id.
 
 at 889. These five aggravators were weighed against several nonstatutory miti-gators. On appeal, this Court found the sentence proportionate and affirmed.
 
 Id.
 
 at 905.
 

 In
 
 Murray v. State,
 
 3 So.3d 1108 (Fla.),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009), Murray was convicted of burglary of the victim’s home, sexual battery and first-degree murder. She had been beaten, stabbed, sexually battered, and strangled.
 
 Id.
 
 at 1114. Murray declined to present any mitigation and the court found four aggravators—
 
 *1030
 
 prior violent felony, commission of the murder during a burglary or sexual battery or both, financial gain, and HAC. The court found five nonstatutory mitigators.
 
 Id.
 
 This Court found the sentence proportionate and affirmed.
 
 Id.
 
 at 1125.
 
 See also Johnston v. State,
 
 841 So.2d 349, 361 (Fla.2002) (finding death sentence proportionate for sexual battery, beating, and strangulation where aggravators included prior violent felony, murder in course of a felony, and HAC weighed against one statutory mitigator and numerous nonstatuto-ry mitigators).
 

 Based on the foregoing, we conclude that the death sentence in this case is proportionate when considered in light of other death sentences that this Court has affirmed in cases involving similar circumstances of the murder, similar aggravators, and similar mitigation.
 

 CONCLUSION
 

 After a review of the issues raised by Barnes and after our independent review of the sufficiency of the evidence, the knowing, intelligent, and voluntary nature of Barnes’ plea, and the proportionality of his sentence, we affirm Barnes’ conviction for first-degree murder, as well as his other convictions, and we affirm the sentence of death.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 CANADY, J., concurs in result only.
 

 [1]
 

 .
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (requiring a hearing to determine if an accused's unequivocal request for self-representation should be granted).
 

 [2]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688, 691 (Fla.1993) (holding that the trial court should conduct a hearing to allow the parties to be heard, including the defendant in person, and to allow presentation of additional evidence before sentencing). The trial court conducted the
 
 Spencer
 
 hearing in this case as the penalty-phase evidentiary hearing because Bames waived an advisory juiy.
 

 [3]
 

 . The court found the following aggravators: (1) the murder was committed by one under sentence of imprisonment (great weight); (2) Barnes was previously convicted of another capital felony or felony involving use or threat of violence (murder of his wife in 1997) (great weight); (3) the murder was committed while Barnes was engaged in commission of a sexual battery and burglary (great weight); (4) the murder was committed for the purpose of avoiding or preventing a lawful arrest (great weight); (5) the murder was especially heinous, atrocious or cruel (great weight); and (6) the murder was cold, calculated and premeditated (great weight).
 

 [4]
 

 . The court found one statutory mitigator, that Barnes was under the influence of extreme mental or emotional disturbance, and accorded it slight weight.
 

 [5]
 

 . The nonstatutory mitigators were: (1) Barnes came forward and revealed his involvement in the unsolved crime (little weight); (2) he took responsibility for his acts (little weight); (3) he was under the influence of a mental or emotional disturbance (duplicating statutory mitigator and given little weight); (4) he has experienced prolonged drug use (little weight); (5) he did not have the benefit of a loving relationship with his mother (little weight); (6) he did not have the benefit of a loving relationship with his father (little weight): (7) he was sexually abused as a child (slight weight); (8) he has taken steps to improve himself (little weight); and (9) he is a functional and capable person and has demonstrated by his action and participation in this case that he has sufficient intelligence and capabilities to contribute to socieLy (little weight).
 

 [6]
 

 . Because the conviction for which the death penalty was imposed in this case was the result of Barnes’ guilty plea, our mandatory review “shifts to the knowing, intelligent, and voluntary nature of that plea.”
 
 Tanzi v. State,
 
 964 So.2d 106, 121 (Fla.2007) (quoting
 
 Winkles v. State,
 
 894 So.2d 842, 847 (Fla.2005));
 
 see also Guardado v. State,
 
 965 So.2d 108, 118
 
 *1015
 
 (Fla.2007);
 
 Lynch v. State,
 
 841 So.2d 362, 375 (Fla.2003);
 
 Ocha v. State,
 
 826 So.2d 956, 965 (Fla.2002).
 

 [7]
 

 . Florida Rule of Criminal Procedure 3.111, Providing Counsel to Indigents, provides in pertinent part:
 

 A defendant shall not be considered to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused’s comprehension of that offer and the accused's capacity to make a knowing and intelligent waiver. Before determining whether the waiver is knowing and intelligent, the court shall advise the defendant of the disadvantages and dangers of self-representation.
 

 Fla. R.Crim. P. 3.111(d)(2).
 

 [8]
 

 . Pursuant to Barnes' motion to suppress the videotaped interview by Insco, the court conducted an inquiry to determine if Insco was an agent of the police. After taking testimony and reviewing the letters Barnes wrote to Hunt, as well as the videotape of the interview with Insco, the court ruled that Barnes' videotaped statement was freely and voluntarily given, that Barnes initiated contact with the State and appeared in the interview at his own request, and that Insco was not an agent of the police, but was an agent of Barnes. Barnes did not appeal this ruling.
 

 [9]
 

 . Dr. Riebsame testified that he could provide "impressions” concerning Barnes' condition, but not a formal diagnosis, due to Barnes’ refusal to cooperate with the evaluation.
 

 [10]
 

 . Florida Rule of Appellate Procedure 9.142(a)(6) expressly provides that "[i]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”
 
 Id.
 

 [11]
 

 . It should be noted that numerous
 
 Faretta
 
 inquiries were conducted throughout the case. Barnes continued to reject offers of counsel that were made at every critical stage in the proceedings, in compliance with the requirement, reiterated in
 
 Muehleman v. State,
 
 3 So.3d 1149 (Fla.2009), as follows:
 

 [W]here the right to counsel has been properly waived, the State may proceed with the stage at issue; but the waiver applies only to the present stage and must be renewed at each subsequent crucial stage where the defendant is unrepresented.
 

 Id.
 
 at 1156 (quoting
 
 Traylor v. State,
 
 596 So.2d 957, 968 (Fla. 1992)).
 

 [12]
 

 . U.S. Const, amend. VI.
 

 [13]
 

 .
 
 Furman v. Georgia,
 
 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
 

 [14]
 

 .
 
 Crawford v. Washington,
 
 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that testimonial statements are inadmissible against a defendant unless the witness appears at trial or, if unavailable, the defendant had a prior opportunity for cross-exami-naLion).
 

 [15]
 

 . Section 921.141(1) provides in pertinent part as follows:
 

 In the [penalty phase] proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under tire exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
 

 § 921.141(1), Fla. Stat. (2007). Barnes has not challenged the statute, but simply argues that under the circumstances of his case, he did not have a fair opportunity to rebut the hearsay.
 

 [16]
 

 . Because we conclude that the claim is procedurally barred and even if not barred, that any error is harmless beyond a reasonable doubt, we do not reach the State's request that we recede from the holding in
 
 Rodgers v. State,
 
 948 So.2d 655 (Fla.2006), that
 
 Crawford
 
 and die Confrontation Clause apply in capital penalty phase and sentencing proceedings.
 
 See
 
 948 So.2d at 663 CTA] defendant's rights under the Confrontation Clause apply to the guilt phase, the penalty phase, and sentencing.'').
 

 [17]
 

 . Overton also murdered the female victim’s husband.