[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11530

_____

JAMES BARNES,

Petitioner - Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 25, 2018)

Before WILLIAM PRYOR, MARTIN, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Petitioner James Barnes, a Florida death row prisoner, appeals the district

court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. The

district court granted a certificate of appealability ("COA") as to its ruling that the

state trial court's appointment of special counsel to present mitigation evidence did not violate Petitioner's Sixth Amendment right to self-representation as recognized by the Supreme Court in *Faretta v. California*, 422 U.S. 806 (1975).  After review and with the benefit of oral argument, we conclude that federal habeas relief is not warranted on Petitioner's *Faretta* claim.  Accordingly, we **AFFIRM**.

## BACKGROUND

### I.    Petitioner's Crime

In 2005, while serving a life sentence for the strangulation murder of his wife, Petitioner confessed to the 1988 rape and murder of Patricia Miller.  *See Barnes v. State*, 29 So. 3d 1010, 1013 (Fla. 2010).[1]  As recounted in his confession, Petitioner entered Ms. Miller's condominium on the night of the murder, took off all his clothes, and armed himself with a knife from the kitchen.  *See id.* at 1015.  After surreptitiously watching Ms. Miller for a short period of time, Petitioner confronted her and forced her at knife-point to the bedroom, where he sexually assaulted her.  *See id.*  He then bound her hands and feet, sexually assaulted her again, and tried to strangle her to death with a belt.  *See id.*  When the strangulation attempt was unsuccessful, Petitioner killed Ms. Miller by hitting her in the head with a hammer he had found in her bedroom.  *See id.*  Petitioner then set fire to the

---

[1]  We take the facts surrounding Petitioner's crime, which are undisputed, from the Florida Supreme Court's ruling on Petitioner's direct appeal.  *See Barnes v. State*, 29 So. 3d 1010, 1013, 1015–16 (Fla. 2010).

bed where Ms. Miller's body lay to destroy any evidence left there before fleeing the scene. *See Barnes*, 29 So. 3d at 1015.

Firefighters discovered Ms. Miller's body while responding to a fire alarm at the condominium complex. *See id.* The medical examiner autopsied the body and noted signs of attempted strangulation, but ultimately determined that Ms. Miller had died from multiple hammer strikes to her head. *See id.* Although Petitioner had attempted to destroy any evidence of the crime by setting the fire, semen was recovered from Ms. Miller and preserved for DNA testing. *See id.* Within a week of the murder, the police questioned Petitioner as a potential suspect, but he denied any involvement. *See id.* Petitioner provided a sample of his blood for DNA comparison, but the DNA testing method available in 1988 was inadequate to produce a match due to the small amount of semen that had been collected, and the case remained unsolved. *See Barnes*, 29 So. 3d at 1016.

In 1998, while Petitioner was incarcerated for his wife's murder, the semen collected from Ms. Miller was retested with advanced techniques and produced a positive match to Petitioner. *See id.* Before charges were filed against him, Petitioner wrote to an assistant state attorney requesting an interview concerning the Miller case. *See id.* During the interview, Petitioner admitted to the rape and murder of Ms. Miller. *See id.* He described with accuracy Ms. Miller's physical appearance and the interior of her condominium, and he provided details of the

3

murder, rape, and arson that were consistent with the forensic evidence that was gathered by the police.  *See id.*

## II.    <u>Trial and Sentencing</u>

Petitioner was charged with murder, burglary, sexual battery by use of a deadly weapon, and arson, and the State indicated that it intended to seek the death penalty on the murder charge.  *See Barnes*, 29 So. 3d at 1013, 1016.  At his initial appearance, Petitioner waived his right to counsel and moved to proceed *pro se*. *See id.* at 1016.  The trial court conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975)[2] and found Petitioner competent to represent himself, but appointed standby counsel.  *See id.* at 1013–14, 1016–17.

Petitioner pled guilty to all of the charges against him and waived his right to an advisory sentencing jury.  *See id.* at 1014.  In preparation for the penalty phase hearing, the trial judge ordered a presentence investigation report ("PSR") to be prepared.  *See id.*  In addition, the judge ordered Petitioner's school records and appointed Dr. William Riebsame, a forensic psychologist, to evaluate Petitioner. *See Barnes*, 29 So. 3d at 1014.

---

[2]  In *Faretta*, the Supreme Court held that an accused has a Sixth Amendment right to represent himself in his criminal trial when he "knowingly and intelligently" elects to do so.  *Faretta*, 422 U.S. at 835.  When a defendant asserts his right to self-representation under *Faretta*, the trial court must conduct an inquiry to ensure that the defendant's decision to represent himself is voluntary, and that it is made intelligently and with awareness of the "dangers and disadvantages of self-representation."  *Id.*

During the penalty phase proceedings, the State presented the following evidence in support of various aggravators:  (1) testimony of detective Dennis Nichols that when he entered Ms. Miller's apartment he found the charred remains of her nude body on the bed, with her hands tied behind her back with shoelaces, (2) testimony of Assistant State Attorney Michael Hunt that Petitioner had written him a letter stating that a fellow inmate had persuaded him, as a converted Muslim, to confess to Ms. Miller's unsolved murder during Ramadan, (3) a videotaped interview of Petitioner describing Ms. Miller's murder, (4) testimony of the medical examiner that Ms. Miller died from blunt-force trauma following multiple blows to her head consistent with being beaten with a hammer, (5) Petitioner's confession explaining that he struck the back of Ms. Miller's head several times with the metal end of a hammer, then struck her fractured skull with the wooden end of the hammer to conceal the identity of the murder weapon, (6) forensic evidence showing that Petitioner attempted to strangle Ms. Miller prior to killing her with a hammer, and that he set her body on fire after her death, (7) DNA evidence matching semen found in Ms. Miller's body to Petitioner, and (8) an impact statement from the victim's sister stating that Ms. Miller was a nurse who loved to backpack, ride horses, hike with her dog, ski, canoe, and bird watch, and who was generous and active with the Salvation Army domestic abuse program in her community.  *See id.* at 1018–19.

5

At the conclusion of the State's penalty phase presentation, Petitioner announced that he did not plan to present any mitigation evidence. *See id.* at 1019. Petitioner explained that, as mitigation, he would rely solely on the fact that he confessed and took responsibility for the murder. *See id.* The trial judge inquired whether Petitioner wanted appointed counsel to develop mitigation evidence, but Petitioner declined. *See id.* The judge then asked standby counsel, who had appeared at the hearing, what steps he would take to develop mitigation evidence if he was representing Petitioner. *See Barnes*, 29 So. 3d at 1019. Standby counsel replied that he would gather all of Petitioner's school, medical, and mental health records, and that he would interview anyone he could locate who had ever had substantial contact with Petitioner. *See id.* Following this colloquy, the judge continued the penalty phase proceedings and appointed special counsel to investigate any available mitigation evidence. *See id.* Petitioner objected to the appointment, reiterating that his strategy was to facilitate a final resolution of the case by confessing and taking responsibility for Ms. Miller's murder. *See id.*

The trial judge reconvened the penalty phase proceedings several months later, and again offered to appoint counsel for Petitioner. *See id.* When Petitioner declined the offer, the judge conducted a second *Faretta* inquiry and concluded that Petitioner had made a voluntary, knowing, and intelligent decision to represent himself. *See Barnes*, 29 So. 3d at 1019. After the *Faretta* inquiry, special counsel

6

presented the mitigation evidence he had discovered during his investigation. *See id.* The evidence primarily came from Dr. Riebsame, who testified that Petitioner had suffered from behavioral and emotional problems since he was young, that he had an antisocial personality disorder, and that he was under the emotional or mental disturbance of cocaine dependency at the time of the offense. *See id.* at 1020. Dr. Riebsame arrived at these conclusions by reviewing the available documentary and forensic evidence and by consulting a report prepared by a mitigation expert who had interviewed Petitioner's family members.[3] *See id.* at 1019–20. Petitioner cross-examined Dr. Riebsame, but he did not offer any witnesses or other evidence and he advised the trial court that he would not submit a sentencing memorandum. *See id.*

Based on the evidence presented during the penalty phase proceedings, the trial court found six aggravators, each of which the court determined was entitled to great weight: (1) Petitioner committed the murder while under sentence of imprisonment, (2) he previously was convicted of another capital felony or felony involving the use or threat of violence, (3) he committed the murder while engaged in the commission of a sexual battery and burglary, (4) he committed the murder for the purpose of avoiding lawful arrest, (5) the murder was especially heinous,

---

[3] Dr. Riebsame had attempted to evaluate Petitioner in 2006, but was unable to provide a full diagnosis of Petitioner's mental condition at that time because Petitioner refused to cooperate. *See Barnes*, 29 So. 3d at 1019. The specially appointed mitigation counsel asked Dr. Riebsame to attempt a reevaluation based on documentary evidence and witness interviews. *See id.*

7

atrocious, or cruel, and (6) the murder was cold, calculated, and premeditated.  *See Barnes*, 29 So. 3d at 1014, n.3.  The court found one statutory and nine non-statutory mitigators, each of which it determined was entitled to little or slight weight:  (1) Petitioner was under the influence of an extreme mental or emotional disturbance when he committed the crime (statutory and non-statutory), (2) he came forward and revealed his involvement in the unsolved crime, (3) he took responsibility for his acts, (4) he has experienced prolonged drug use, (5) he did not have the benefit of a loving relationship with his mother or father, (6) he was sexually abused as a child, (7) he has taken steps to improve himself, and (8) he is a functional and capable person who demonstrated by his participation in the case that he can contribute to society.  *See id.* at n.4, 5.  The court concluded that each aggravator, standing alone, outweighed all of the mitigating factors combined.  *See id.* at 1014.  It sentenced Petitioner to death for the murder, to life for the burglary and sexual battery, and to thirty years for the arson.  *See id.*

## III.    Direct Appeal and State Post-Conviction Proceedings

The Florida Supreme Court affirmed Petitioner's convictions and sentences on direct appeal.  *See id.* at 1013.  Among other claims asserted in support of his direct appeal, Petitioner argued that the trial court had violated his Sixth Amendment right to self-representation, as recognized by the United States Supreme Court in *Faretta*, by appointing special counsel to investigate and present

8

mitigation evidence during the penalty phase of his trial.  *See Barnes*, 29 So. 3d at 1022.  The Florida Supreme Court considered and rejected Petitioner's Sixth Amendment self-representation claim on the merits.  *See id.* at 1022–26.  The United States Supreme Court denied certiorari.  *Barnes v. Florida*, 562 U.S. 901 (2010).

Petitioner filed a motion for post-conviction relief pursuant to Rule 3.851 of the Florida Rules of Criminal Procedure.  *See Barnes v. State*, 124 So. 3d 904 (Fla. 2013).  The state court denied the motion.  *See id.* at 907.  Its decision was affirmed by the Florida Supreme Court.  *See id.*

## IV.    Petitioner's Federal Habeas Petition and Appeal

Petitioner subsequently filed a petition for habeas corpus in federal court pursuant to 28 U.S.C. § 2254, asserting four grounds for relief:  (1) a claim that his Sixth Amendment right to self-representation was violated by the trial court's appointment of special counsel to investigate and present mitigation evidence during the penalty phase of his trial, (2) a Confrontation Clause claim arising from the trial court's allegedly erroneous admission of hearsay evidence, (3) an ineffective assistance of counsel claim based on standby counsel's failure to request a competency hearing prior to the entry of Petitioner's guilty plea, and (4) a claim that Petitioner may be incompetent by the time of his execution, such that his execution would violate the Eighth Amendment.  The district court denied all of

Petitioner's claims.  The court declined to issue a certificate of appealability

("COA") as to Petitioner's Confrontation Clause, ineffective assistance, and

competency claims, but it granted a COA as to the Sixth Amendment self-

representation issue.

Petitioner appealed the denial of his § 2254 petition, and Capital Collateral

Regional Counsel ("CCRC") attorney Ali Shakoor filed a motion in this Court to

expand the COA to include Petitioner's Confrontation Clause and competency

claims.  Petitioner responded with a *pro se* motion to discharge Shakoor as his

counsel, as well as a motion to dismiss Shakoor's motion to expand the COA.  In

his motion to discharge Shakoor, Petitioner did not ask the Court to appoint

alternate counsel.  Instead, Petitioner indicated that he was specifically electing to

proceed *pro se* in this habeas appeal.

Citing record evidence establishing that Petitioner was competent to

represent himself, and noting that federal litigants have a statutory right to pursue

their claims *pro se* pursuant to 28 U.S.C. § 1654, we granted Petitioner's motion to

discharge Shakoor as his counsel.  In our order granting the motion, we stated that

Petitioner would "henceforth be responsible for representing himself in this habeas

appeal."  Nevertheless, we continued Shakoor's appointment to serve as standby

counsel.  We further advised Shakoor that, in his capacity as standby counsel, he

would be served all pleadings in the case and should be ready to respond or resume his representation of Petitioner as directed by the Court.

In accordance with Petitioner's decision to proceed *pro se*, we denied the motion Shakoor had filed to expand the COA. We noted that Petitioner had indicated in his motion to discharge Shakoor his disagreement with any expansion of the COA. In addition, we concluded that an expansion of the COA was not warranted because Petitioner's Confrontation Clause claim was procedurally barred and his competency claim lacked evidentiary support.

By separate order, we advised Petitioner that his *pro se* brief on the Sixth Amendment self-representation issue was due on July 24, 2017. In the same order, we directed Shakoor to file a supplemental brief on the Sixth Amendment issue by August 14, 2017 and to file a reply brief within 14 days of service of the State's response. We also directed Shakoor to appear at oral argument on Petitioner's behalf.

Petitioner failed to file a *pro se* brief by the July 24, 2017 deadline. We instructed Petitioner that he could correct the deficiency by submitting a motion to file the brief out of time on or before August 14, 2017, but Petitioner also failed to comply with that deadline and failed thereafter to file any motions or briefing in support of his appeal. Shakoor filed opening and reply briefs addressing the Sixth Amendment issue, and he appeared at oral argument on Petitioner's behalf, as he

11

was instructed to do.  The State also filed a brief on the issue and appeared at oral argument.

## DISCUSSION

### I.    Standard of Review

We review the district court's denial of Petitioner's Sixth Amendment claim *de novo*, applying the standards set forth in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *Peterka v. McNeil*, 532 F.3d 1199, 1200 (11th Cir. 2008).  Under AEDPA, a federal court cannot grant habeas relief on a claim that was "adjudicated on the merits in State court proceedings" unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  For purposes of AEDPA, clearly established federal law includes only the holdings of Supreme Court decisions—not Supreme Court dicta and not the opinions of this Court. *White v. Woodall*, 134 S. Ct. 1697, 1702 & n.2 (2014).

As is evident from the standards set out above, AEDPA "greatly circumscribe[s]" a federal court's authority to grant habeas relief on a claim that has been adjudicated on the merits by a state court.  *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002).  *See also Trepal v. Sec'y, Fla. Dep't of Corr.*, 684

F.3d 1088, 1107 (11th Cir. 2012) (noting that AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt" (internal quotation marks omitted)).  A federal court may grant habeas relief under the "contrary to" clause only if the state court "applie[d] a rule different from the governing law set forth" in Supreme Court precedent or "decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A federal court may grant habeas relief under the "unreasonable application" clause if the state court "correctly identifie[d] the governing legal principle" from Supreme Court precedent but "unreasonably applie[d] it to the facts of the particular case." *Id.*  However, a state court's decision must be "objectively unreasonable, not merely wrong" in order to warrant relief under the "unreasonable application" clause.  *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (internal quotation marks omitted).  Even "clear error" does not meet the "objectively unreasonable" standard.  *Id.*  Rather, the state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (internal quotation marks omitted).

Likewise, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless [the

13

decision is] objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)). Further, a state court's factual determinations are "presumed correct" unless they are rebutted by "clear and convincing evidence to the contrary." *Id.* (citing 28 U.S.C. § 2254(e)(1)).

## II.     Petitioner's Sixth Amendment Claim

### A.     The Sixth Amendment Right to Self-Representation

 In *Faretta v. California*, 422 U.S. 806 (1975), the United States Supreme Court held that a criminal defendant has a right to represent himself at trial "when he voluntarily and intelligently elects to do so." *Faretta*, 422 U.S. at 807. *See also Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (citing *Faretta* for the "well settled" proposition that a criminal defendant "has the right to proceed without counsel when he voluntarily and intelligently elects to do so" (internal quotation marks omitted)). The Supreme Court's holding in *Faretta* was based on "the long-standing recognition of a right of self-representation in federal and most state courts, and on the language, structure, and spirit of the Sixth Amendment." *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984).

The Supreme Court acknowledged in *Faretta* that when a criminal defendant chooses to represent himself, "he relinquishes . . . many of the traditional benefits associated with the right to counsel," which is also guaranteed by the Sixth

Amendment. *Faretta*, 422 U.S. at 835. As such, the *Faretta* Court imposed a substantial check on the right of self-representation by requiring that a defendant "be made aware of the dangers and disadvantages of self-representation" prior to being allowed to proceed without counsel, and that the record show that the defendant, having been so advised, "knows what he is doing and his choice is made with eyes open." *Id.* (internal quotation marks omitted). As a result of this requirement, a trial court must ensure—via what has come to be known as a *Faretta* inquiry—that a defendant who asserts the right to self-representation is "competent[] and understanding" and that he has "voluntarily" as well as "knowingly and intelligently" elected to dispense with his right to the assistance of counsel. *See id.* (internal quotation marks omitted).

Even assuming the above requirements are met, the right to self-representation recognized in *Faretta* is not absolute. *See id.* at 834, n.46. The *Faretta* Court noted, for example, that a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* In later decisions, the Supreme Court confirmed that the right to self-representation is subject to other limitations as well. *See Indiana v. Edwards*, 554 U.S. 164, 178 (2008) (holding that a state may deny a defendant the right to represent himself if he lacks the mental competency to conduct his defense, even though the defendant is competent to stand trial);

15

*Martinez v. Court of App. of Cal.*, *Fourth App. Dist.*, 528 U.S. 152, 154 (2000) (holding that a criminal defendant has no constitutional right to self-representation on appeal).

Of particular significance to this appeal, the *Faretta* Court indicated that a trial court could appoint standby counsel to aid in the defense, even over the objection of a *pro se* criminal defendant. *See Faretta*, 422 U.S. at 834, n.46. In *McKaskle v. Wiggins*, 465 U.S. 168 (1984), the Supreme Court addressed in more detail the proper role of standby counsel who is present at trial over the objection of a *pro se* criminal defendant. *See Wiggins*, 465 U.S. at 170 ("Today we must decide what role standby counsel who is present at trial over the defendant's objection may play consistent with the protection of the defendant's *Faretta* rights."). The defendant in *Wiggins* argued that standby counsel's unsolicited participation in his trial, primarily via motions practice and other arguments made to the trial judge outside the presence of the jury, deprived him of the right to self-representation as recognized in *Faretta.* The Supreme Court rejected the defendant's argument, holding that the unsolicited participation of standby counsel did not violate *Faretta* under the circumstances. *Id.* at 173.

The *Wiggins* Court identified the core rights protected by *Faretta* as (1) the right of a *pro se* defendant to "have his voice heard" and (2) the right of a *pro se* defendant to "present his case in his own way." *Id.* at 174, 177. To protect those

16

rights, the Court explained, a *pro se* defendant "must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *Id.* at 174. The record showed that the defendant in *Wiggins* had been allowed to do all of those things: he had filed and argued numerous pretrial and trial motions, conducted voir dire, made opening and closing statements to the jury, selected and cross-examined witnesses, made objections, filed requested jury charges, and elected to go to the jury at the penalty phase of the trial. *See id.* at 174–75. Furthermore, it was apparent from the record that the participation of standby counsel, albeit unsolicited, had not interfered with the defendant's right to be heard or to present his case in his own way because the trial judge had deferred to the defendant when disagreements arose regarding trial strategy and because counsel's participation (1) generally occurred outside the presence of the jury and, thus, did not undermine the jury's perception that the defendant was representing himself, and (2) primarily involved routine procedural matters when it did occur in the presence of the jury. *See Wiggins*, 465 U.S. at 180–85.

In the course of its holding, the *Wiggins* Court acknowledged that "excessively intrusive participation" by standby counsel, particularly in the presence of the jury, could erode a *pro se* defendant's *Faretta* rights under certain

17

circumstances. *See id.* at 177. The Court reiterated that a *pro se* defendant is entitled to preserve control over the case he chooses to present to the jury and that, in the absence of the defendant's consent, standby counsel should not be allowed to substantially interfere with the defendant's tactical decisions in that regard or, alternatively, to destroy the jury's perception that the defendant is representing himself. *See id.* at 178. In proceedings outside the presence of the jury, the Court explained, standby counsel's participation does not raise the same concerns. *See id.* at 179. In that setting, the Court reasoned, a *pro se* defendant's *Faretta* rights are adequately protected if:

> the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel.

*Id.*

### B.    The Florida Supreme Court's Ruling on Petitioner's Sixth Amendment Claim

As noted, Petitioner argued in his direct appeal that the state trial court violated his *Faretta* rights when it appointed special counsel to develop and present penalty phase mitigation evidence. *See Barnes*, 29 So. 3d at 1022. The Florida Supreme Court considered and rejected that argument on the merits. *See id.* at 1023–26. The Florida Supreme Court's ruling on Petitioner's self-representation claim is the relevant state court decision for purposes of AEDPA

18

review.  *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1231 (11th Cir. 2014) (noting that "the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision . . . under AEDPA" (internal quotation marks omitted)).

In ruling on Petitioner's claim, the Florida Supreme Court recognized that *Faretta* establishes a right to self-representation but that the right is not absolute. *See Barnes*, 29 So. 3d at 1025–26 (citing *Indiana v. Edwards*, 554 U.S. 164 (2008) for the proposition that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer" (internal quotation marks omitted)).  For example, the Florida court observed, *Faretta* is not violated when a state requires a severely mentally ill but otherwise competent defendant to be represented by counsel.  *See id.* at 1025. Honing in on the particular issue presented by Petitioner's case, the Florida court cited *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152 (2000) and *McKaskle v. Wiggins*, 465 U.S. 168 (1984) for the principle that standby counsel can, consistent with *Faretta*, participate in a *pro se* defendant's trial without the defendant's consent "as long as that participation does not seriously undermine the appearance before the jury that the defendant is representing himself."  *See Barnes*, 29 So. 3d at 1026 (internal quotation marks omitted and alteration adopted).

19

Applying *Faretta* and its progeny, the Florida Supreme Court held that special counsel's investigation into and presentation of mitigation evidence did not violate Petitioner's self-representation rights under the circumstances of this case. *See id.* First, the court emphasized that special counsel's mitigation presentation did not occur in the presence of the jury, an important factor in the Supreme Court's case law addressing the proper role of standby counsel in a *pro se* defendant's trial. *See id.* at 1024. Second, the court observed that special counsel's mitigation presentation supplemented, but did not conflict with or undermine, the mitigation strategy pursued by Petitioner, which was to rely on the fact that he confessed and took responsibility for the murder. *See id.* at 1026. To that end, the Florida court noted that the trial judge found as a mitigating factor that Petitioner had confessed to his involvement in the crime and accepted responsibility for his acts. *See id.*

Finally, the Florida Supreme Court found it significant that special counsel's mitigation presentation occurred during the penalty phase of a capital trial, with its attendant obligation to ensure that the defendant "received individualized sentencing and that the death penalty is fairly and constitutionally imposed." *See Barnes*, 29 So. 3d at 1026. The Florida court explained that it was reluctant to accept Petitioner's *Faretta* argument in this context, stating:

> We decline to hold, as [Petitioner] requests, that a trial court may never consider other mitigation contained in the record or appoint special

20

mitigation counsel to assist the court, where a pro se defendant's refusal to present mitigating evidence impedes or prevents the trial court's exercise of its constitutional duty to provide individualized sentencing.

*Id.*

## C.    Analysis

There is no basis to conclude that the Florida Supreme Court's denial of Petitioner's Sixth Amendment self-representation claim was either "contrary to" or an "unreasonable application" of Supreme Court precedent, or that it resulted from an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d). Consequently, federal habeas relief is not warranted on the claim, and the district court properly denied it.

We first note that the Florida Supreme Court reasonably construed the Supreme Court precedent derived from *Faretta* and its progeny. *See Barnes*, 29 So. 3d at 1025–26. As correctly summarized by the Florida court, *Faretta* establishes a right to self-representation for criminal defendants, but the right is not absolute. *See id.* In particular, and as further recognized by the Florida court, the participation of standby counsel, even over the objection of a *pro se* defendant, is consistent with *Faretta* as long as counsel does not seriously interfere with the defendant's opportunity to present his own case or undermine the jury's perception that the defendant is representing himself. *See id.* at 1026 (citing *Martinez*, 528 U.S. at 162 and *Wiggins*, 465 U.S. at 187). Because the Florida court identified

21

*Faretta* as the controlling precedent, and accurately characterized the protections set forth in *Faretta* and developed in subsequent Supreme Court case law, it cannot be said that the Florida court's decision was "contrary to" clearly established federal law.

Nor was the Florida Supreme Court's decision an "unreasonable application" of *Faretta.*  Again, to trigger habeas relief under the "unreasonable application" clause, a state court's ruling must contain an error that so obvious that it is "beyond any possibility for fairminded disagreement."  *Woodall*, 134 S. Ct. at 1702 (internal quotation marks omitted).  Applied in the context of *Faretta* and subsequent Supreme Court precedent such as *Wiggins*, such an error would require, at the very least, the unsolicited participation of standby counsel in a manner that (1) patently interfered with a *pro se* defendant's right to be heard or to present his own case, (2) resolved a disagreement between counsel and the *pro se* defendant in counsel's favor when the defendant's choice would normally govern, or (3) "destroy[ed] the jury's perception that the defendant [wa]s representing himself." *See Wiggins*, 465 U.S. at 174, 178.  In rejecting Petitioner's *Faretta* claim, the Florida Supreme Court reasonably concluded that special counsel's participation in Petitioner's trial did not violate any of these.

First, the record supports the Florida Supreme Court's finding that Petitioner's core *Faretta* right to be heard was adequately vindicated.  *See Wiggins*,

22

465 U.S. at 174. Petitioner does not dispute that he was "allowed to address the court freely on his own behalf" throughout his criminal proceeding. *See id.* at 179. He filed and argued motions, made objections, argued points of law, and questioned a witness who testified during special counsel's mitigation presentation. *See Barnes*, 29 So. 3d at 1013–20. He made the strategic decision to plead guilty and to proceed without a jury at the penalty phase of his trial, and he was permitted to present his own theory of mitigation, which resulted in the trial court finding as a non-statutory mitigator that Petitioner had confessed to his crime and taken responsibility for his actions. *See id.*

Further, the record supports the Florida Supreme Court's finding that special counsel's mitigation presentation did not substantially erode Petitioner's *Faretta* rights. The presentation supplemented, but did not conflict with, Petitioner's asserted theory of mitigation, and it was made to the trial judge, rather than to a jury. *See Wiggins*, 465 U.S. at 179 ("A trial judge, who . . . receives a defendant's original *Faretta* request and supervises the protection of the right throughout the trial, must be considered capable of differentiating the claims presented by a *pro se* defendant from those presented by standby counsel."). Moreover, the presentation occurred during the penalty phase of a capital trial, after Petitioner had refused to present any mitigation evidence whatsoever, thus limiting the trial judge's ability to provide the "individualized sentencing" required in that context. *See Kansas v.*

23

*Marsh*, 548 U.S. 163, 174 (2006) ("The use of mitigation evidence is a product of the requirement of individualized sentencing.").

Standby counsel Shakoor cites in his supplemental brief the decision of the Fifth Circuit on direct review that the appointment of independent mitigation counsel violated the right of a defendant to represent himself, *United States v. Davis*, 285 F.3d 378 (5th Cir. 2002), but his reliance on that decision is misplaced. The decision of a federal court of appeals is not, and does nothing to change, "clearly established federal law" within the meaning of AEDPA. *See Woodall*, 134 S. Ct. at 1702 & n.2. And it does not matter that the Fifth Circuit disagreed with the reasoning of the Florida Supreme Court so long as there was "any possibility for fairminded disagreement." *LeBlanc*, 137 S. Ct. at 1728 (internal quotation marks omitted). For the reasons that we have explained, the state court's interpretation of the relevant Supreme Court precedents was not "objectively unreasonable," irrespective of whether we would agree with it on direct review. *Id.* (internal quotation marks omitted).

The case before the Fifth Circuit also was different from this appeal in two key respects. First, the independent counsel presented mitigation evidence to a sentencing jury, *see Davis*, 285 F.3d at 380, and we have explained that *Faretta* and its progeny place crucial weight on the "jury's perception." *Wiggins*, 465 U.S. at 178. Barnes waived his right to an advisory jury, and mitigation counsel

24

appeared only before the judge.  Second, the Fifth Circuit concluded that "Davis's strategy was in direct conflict with the independent counsel's approach." *Davis*, 285 F.3d at 385.  In contrast, we have explained that the Florida Supreme Court reasonably determined that the presentation by special counsel did not conflict with Barnes's asserted theory of mitigation.

Shakoor also argues that some of the information presented by special counsel was aggravating, including evidence that Petitioner had been a pyromaniac from an early age, that as a child he had assaulted family members and peers in various settings, and that his score on a psychological assessment conducted by Dr. Riebsame classified him as a psychopath.  Contrary to Shakoor's suggestion, there is no evidence in the record that special counsel's mitigation presentation prejudiced Petitioner.[4]  Rather, it appears that the mitigation presentation inured to Petitioner's benefit because it resulted in the trial court finding numerous additional mitigators, including the statutory mitigator that Petitioner was "under the influence of a mental or emotional disturbance at the time of the offense" and the non-statutory mitigators that he "had an abusive childhood, lacked a loving relationship with his parents, and was a functional and capable person with a capacity to contribute to society." *See Barnes*, 29 So. 3d at 1026.

---

[4]  We recognize, of course, that the lack of prejudice does not resolve the *Faretta* issue presented by this case. *See Wiggins*, 465 U.S. at 177, n.8 (explaining that the denial of a *pro se* defendant's *Faretta* rights is "not amenable to 'harmless error' analysis.  The right is either respected or denied.").  But in response to Shakoor's argument, we think it important to note that no prejudice resulted.

25

Further, it is clear from the record that the trial judge obtained all of the allegedly aggravating information from sources other than special counsel's mitigation presentation, and that the judge would have been privy to that information even if special mitigation counsel had not been appointed. Florida law requires the preparation of a PSR in all death penalty cases where the defendant waives mitigation or refuses to present mitigation evidence. *See* Fla. R. Crim. P. 3.710(b) (requiring the preparation of a "comprehensive" PSR when a capital defendant refuses to present mitigation evidence); *Muhammad v. State*, 782 So. 2d 343, 363 (Fla. 2001) (announcing the PSR requirement, which later was adopted as a procedural rule).[5] In accordance with that requirement, the trial judge ordered that a PSR be prepared in Petitioner's case. The PSR, which was provided to the trial judge on May 17, 2007 and supplemented on November 16, 2007, contains all of the information Petitioner claims is aggravating.[6]

Specifically, the PSR describes a long history of criminality, violence, and drug use beginning when Petitioner was fifteen years old and continuing until Petitioner murdered his wife when he was 35. The "family history" section of the PSR states that Petitioner had assaulted his mother and sisters, including one

---

[5] Petitioner's appeal does not challenge the constitutionality or validity of the PSR requirement as applied to his case.

[6] Indeed, the PSR contains information that is a great deal more aggravating than any information contained in Dr. Riebsame's testimony. In particular, the PSR includes Petitioner's graphic and detailed description of his prolonged sexual assault of Ms. Miller on the night of her murder.

incident during which he broke his sister's nose by punching her in the face, and that he had been diagnosed as a sociopath. The "mental health" section of the PSR states that Petitioner had been seen by a psychiatrist and psychologist beginning at the age of six for behaviors such as stealing, being cruel to other children, and exposing himself sexually, and that he lacked remorse for his actions and "seemingly show[ed] no emotion." The PSR also reveals that Petitioner had issues with aggression and "firesetting" at a young age. Special counsel's attempt during the mitigation presentation to cast this information—already available to the trial judge as a result of the PSR—in the best light possible in terms of Petitioner's culpability could not possibly have prejudiced Petitioner.

Finally, there is no support for finding that the Florida Supreme Court's decision was based on an unreasonable determination of the facts. Standby counsel Shakoor vaguely asserts in his brief that the state court proceedings "resulted in decisions that w[ere] based on an unreasonable determination of the facts, in light of the evidence presented in the State court." But Shakoor does not cite any evidence in support of that assertion, nor even specify the factual findings he claims were unreasonable. In fact, the parties appear to agree on the essential facts underlying Petitioner's *Faretta* claim: (1) Petitioner asserted his right to self-representation in his criminal proceeding and the trial judge found, after conducting a *Faretta* inquiry, that he was competent to proceed without a lawyer,

27

(2) Petitioner decided to plead guilty and waived his right to an advisory jury, (3) during the penalty phase of his proceeding, Petitioner refused to present any mitigation other than the fact that he had come forward and accepted responsibility for his crime, (4) the trial judge, over Petitioner's objection, appointed special counsel to investigate and present any available mitigating evidence, and (5) special counsel presented mitigation evidence to the trial judge, including evidence regarding Petitioner's background and record. These facts, which were the basis of the Florida Supreme Court's decision on Petitioner's *Faretta* claim, are undisputed and well-supported in the record, meaning they were reasonably determined by the Florida court.

## CONCLUSION

For the above reasons, we **AFFIRM** the district court's order denying federal habeas relief on Petitioner's Sixth Amendment self-representation claim.

MARTIN, Circuit Judge, concurring:

I concur in the opinion of the majority. I write separately in appreciation of the state trial judge's appointment of special counsel for Mr. Barnes. This appointment by the state trial judge allowed development and presentation of mitigation evidence, even here, where Mr. Barnes refused to participate in that process.

The courts are charged with ensuring that death sentences are imposed only in a manner consistent with constitutional requirements. "[C]onsideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991 (1976) (plurality opinion). Without knowledge of a person's individual history and characteristics, "the fundamental respect for humanity underlying the Eighth Amendment" cannot be given. Id.

After the State presented its case for aggravation, Mr. Barnes "refused to present any evidence of mitigation and announced that he would rely only on the fact that he came forward and took responsibility for the murder." Barnes v. State, 29 So. 3d 1010, 1014 (Fla. 2010). His refusal meant the sentencer—here, the trial judge—would not be able to fully consider Mr. Barnes's character and background. So if the judge had not intervened to develop the record, the "process

29

of inflicting the penalty of death" would have proceeded without one of its "constitutionally indispensable" components. See Woodson, 428 U.S. at 304, 96 S. Ct. at 2991; see also Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S. Ct. 869, 875 (1982).

This trial judge did not let that happen. Over Mr. Barnes's objection, the judge ordered a pre-sentence investigation ("PSI"), a mental health evaluation, and school records, also appointing special counsel to investigate and present mitigation. Barnes, 29 So. 3d at 1014.[1] With the help of an investigator, special counsel then prepared and presented a mitigation report to the court. That report revealed that Mr. Barnes's mother was an alcoholic who showed her children no affection; that Mr. Barnes's father was cold and physically abusive; and that Mr. Barnes was likely sexually abused as a child. And special counsel presented the testimony of Dr. Riebsame, a forensic psychologist, who indicated that Mr. Barnes was suffering from an extreme mental disturbance while murdering and sexually assaulting Ms. Miller. Upon reviewing Mr. Barnes's guilty plea and the record created through Barnes's own representation of himself, the trial judge found three

---

[1] "[T]o ensure reliability, fairness, and uniformity in the imposition of the death penalty" when a defendant refuses to present mitigation evidence, Florida trial judges must order a comprehensive PSI and require the State "to place in the record all evidence in its possession of a mitigating nature." Muhammad v. State, 782 So. 2d 343, 363–65 (Fla. 2001). When these records "alert the trial [judge] to the probability of significant mitigation," Florida encourages the trial judge to call its own mitigation witnesses or appoint special counsel for that purpose. Id. at 364. In my view, the Eighth and Fourteenth Amendments surely encourage similar procedures and may well require them.

30

non-statutory mitigators.  But with the help of the PSI, the mitigation report, and Dr. Riebsame's testimony, that judge then found six additional mitigators.  These included one statutory mitigator—that Mr. Barnes was suffering from an extreme emotional disturbance at the time of the offense—and five non-statutory mitigators.[2]  Clearly, the information provided by special counsel and the PSI allowed the court to more "accurately gauge [Mr. Barnes's] moral culpability."  See Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 454 (2009).

Our jurisprudence guarantees Mr. Barnes, and others like him, the right to represent themselves, even when facing a sentence of death.  This guarantee can, of course, be in tension with the obligation of courts to individually assess every defendant facing a death sentence.  See McKaskle v. Wiggins, 465 U.S. 168, 177–78, 104 S. Ct. 944, 950–51 (1984) (explaining that the "core" of the right to self-representation is a pro se defendant's "actual control over the case he chooses to present," which requires ensuring that standby counsel does not "make or substantially interfere with any significant tactical decisions").  This trial judge did a commendable job of balancing both commands.  And, as the majority has explained, the Florida Supreme Court's validation of that judge's actions in this regard was neither contrary to nor an unreasonable application of clearly established federal law.

---

[2] The judge also found a non-statutory mitigator that duplicated the extreme emotional disturbance statutory mitigator.

31