[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10681
_____

D.C. Docket No. 5:10-cv-00489-MTT


MARION WILSON JR.,

                                                        Plaintiff-Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

                                                        Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(August 10, 2018)

**ON REMAND FROM THE
SUPREME COURT OF THE UNITED STATES**

Before ED CARNES, Chief Judge, WILLIAM PRYOR, and JORDAN, Circuit
Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal is on remand from the Supreme Court of the United States for us to reconsider the denial of Marion Wilson Jr.'s petition for a writ of habeas corpus. Wilson, a Georgia prisoner sentenced to death for the murder of Donovan Corey Parks, argues that he was deprived of a fair trial because his counsel provided ineffective assistance during the penalty phase of his trial. In state postconviction proceedings, Wilson argued that his trial counsel were constitutionally ineffective because they failed to discover and introduce mitigating evidence. The state superior court ruled that Wilson's claim of ineffective assistance of counsel failed, and the Supreme Court of Georgia declined to review that decision. After we ruled that the one-line decision of the Supreme Court of Georgia was the relevant decision for our review and affirmed the denial of Wilson's petition, the Supreme Court granted Wilson's petition for writ of certiorari and reversed. *Wilson v. Sellers*, ___ U.S. ___, 138 S. Ct. 1188 (2018). The Supreme Court held that we must "look through" an unexplained decision by a state supreme court to the last reasoned decision and presume that the state supreme court adopted the reasoning in the decision by the lower state court. *Id.* at 1192. Because the superior court reasonably concluded that counsel provided Wilson effective assistance, we affirm the denial of Wilson's petition for a writ of habeas corpus.

2

# I. BACKGROUND

We divide our discussion of the background in three parts. First, we discuss the facts of Parks's murder and the evidence presented at Wilson's trial and sentencing. Second, we discuss Wilson's state petition for a writ of habeas corpus. Third, we discuss Wilson's federal petition.

## A. *Wilson's Trial and Sentencing*

In 1996, Marion Wilson Jr. and Robert Earl Butts killed Donovan Parks in Milledgeville, Georgia. *Wilson v. State*, 525 S.E.2d 339, 343 (Ga. 1999). Wilson and Butts approached Parks in a Wal-Mart parking lot to ask for a ride. *Id.* Wilson, Butts, and Parks then entered Parks's automobile. *Id.* A few minutes later, Parks's dead body was found nearby on a residential street. *Id.* Parks's clothing was saturated with blood, and he had a "gaping" hole in the back of his head. His skull was filled with metal shotgun pellets and a spent shot shell cup.

After officers arrested Wilson, he told the officers that after Parks got in the automobile, Butts pulled out a sawed-off shotgun and ordered Parks to drive around. *Id.* According to Wilson, Butts later told Parks to exit the automobile and lie on the ground, after which Butts shot Parks in the back of the head. *Id.* Wilson and Butts drove Parks's automobile to Atlanta in an attempt to locate a "chop shop" to dispose of the automobile. *Id.* They were unable to find a "chop shop" so they purchased gasoline cans, drove to Macon, and burned the automobile. *Id.*

3

Police later searched Wilson's residence and found a "sawed-off shotgun loaded with the type of ammunition used to kill Parks" and notebooks filled with handwritten gang creeds and symbols. *Id.*

At trial, Wilson was represented by two appointed attorneys, Thomas O'Donnell Jr., who served as lead counsel, and Jon Phillip Carr. *Wilson v. Humphrey*, No. 5:10-CV-489 (MTT), 2013 WL 6795024, at *10 (M.D. Ga. Dec. 19, 2013). They argued that Wilson was "mere[ly] presen[t]" during Butts's crimes, *id.* at *34, but the jury convicted Wilson "of malice murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun," *id.* at *2.

During the penalty phase, defense counsel argued that the jury should not sentence Wilson to death because there was residual doubt about his guilt. *Id.* at *16. They presented evidence that Butts gave inconsistent statements to the police and that Butts confessed to three other inmates that he was the triggerman. Trial counsel again tried to convince the jury that Wilson was "mere[ly] presen[t]" during the crimes.

Trial counsel introduced testimony from Wilson's mother, Charlene Cox. She testified that Wilson had a difficult childhood and did not deserve to die even though he had a history of criminality. She explained that Wilson's father played

no role in Wilson's upbringing, that she supported Wilson by working low-wage jobs, and that Wilson had an 18-month-old daughter. *Id.* at *25.

Trial counsel also introduced testimony from Dr. Renee Kohanski, a forensic psychiatrist. *Id.* at *20. Dr. Kohanski relied on the records defense counsel requested from agencies, schools, and medical facilities, and interviewed Wilson to create a "cursory" social history, but she did not conduct an independent investigation of Wilson's background. *Id.* at *20–21. Dr. Kohanski testified that Wilson had a difficult, sickly, and violent childhood. She explained that Wilson was so aggressive as a child that his elementary school performed a psychological assessment of him. *Id.* at *25. The assessment found that Wilson had difficulty staying on task, a poor self-image, and an "excessive maternal dependence." *Id.* Dr. Kohanski told the jury that school officials also requested a medical evaluation because they suspected that Wilson suffered from an attention deficit disorder, but testing was never performed. *Id.* She testified that Wilson had no parental support or male role model, and that, by age 9 or 10, he fended for himself on the streets and joined a gang as a substitute for a family. *Id.* Dr. Kohanski told the jury that Cox's boyfriends "came and went" and frequently used drugs. *Id.* Dr. Kohanski testified about one "not . . . uncommon event," *id.* at *25, in which six- or seven-year-old Wilson witnessed Cox's "common law" husband hold a gun to Cox's head, *id.* at *17.

5

On cross-examination, both Cox and Dr. Kohanski testified about unfavorable background evidence. Cox admitted that Wilson was incarcerated for every day of his daughter's life and that Cox had difficulty raising Wilson and sometimes needed police assistance to control Wilson. *Id.* at *26. Dr. Kohanski told the jury that Wilson was of average intelligence and suffered from no known brain damage, but that he was in two car accidents as a child and she "would have been interested to see [brain imaging scans from] that time" to look for brain damage. She also testified that, regardless of any possible brain damage, Wilson knew right from wrong at the time of the murder.

The prosecution then presented evidence of Wilson's extensive criminal history. The jury heard that, from the age of 12 years, Wilson was "either out committing crimes or incarcerated somewhere." *Id.* at *22 (alteration adopted). The jury heard that Wilson had been charged with first-degree arson, criminal trespass, and possession of crack cocaine with intent to distribute, and that in a period of 11 weeks Wilson was charged with 10 misdemeanor offenses. *Id.* at *22–24. The jury heard that, as a 15-year-old, Wilson shot a stranger, Jose Valle, in the buttocks because he "wanted to see what it felt like to shoot somebody," *id.* at *22, and that Wilson sold crack cocaine to Robert Underwood and then shot him five times and "casually walked off," *id.* at *23. The jury also heard testimony that

6

Wilson was charged with cruelty to animals after he "shot and killed a small dog for no apparent reason." *Id.*

The prosecution presented other evidence of Wilson's violence and gang activity. The jury heard that Wilson threatened a neighbor and his elderly mother, saying "I'll blow . . . that old bitch's head off"; that Wilson committed unprovoked attacks on his schoolmates; and that Wilson attacked one of the employees during his incarceration at Claxton Regional Youth Development Center. *Id.* at *22–23. The jury heard details of an incident in which a "belligerent" Wilson and five others were shouting at students in a parking lot at Georgia College. *Id.* at *23. When police arrived, Wilson rushed one of the officers and had to be subdued with pepper spray when he attempted to grab the officer's gun. *Id.* The jury heard portions of Wilson's post-arrest interrogation in which he confessed that he was the "God damn chief enforcer" of the Milledgeville FOLKS gang, a rank he achieved by "fighting and stuff like that." *Id.* at *24.

At the close of testimony, the trial court instructed the jury to consider all of the evidence from both the guilt and penalty phases of trial. After deliberating for less than two hours, the jury sentenced Wilson to death for the crime of malice murder. *Id.* at *26. The Supreme Court of Georgia affirmed Wilson's conviction and sentence on direct appeal. *Id.* at *2.

### B. Wilson's State Petition for a Writ of Habeas Corpus

Wilson filed a petition for a writ of habeas corpus in a state court, in which he argued that his trial counsel had been ineffective because they failed to investigate his background thoroughly and to present adequate mitigation evidence at his sentencing. *Id.* at *13; *see Strickland v. Washington*, 466 U.S. 668 (1984). Wilson argued that effective counsel would have interviewed teachers, social workers, and relatives to find mitigation evidence from Wilson's childhood. *Wilson*, 2013 WL 6795024, at *13. He argued that sufficient counsel would have discovered the names of potential witnesses in the records that his trial counsel possessed but never read. *Id.* at *15.

At an evidentiary hearing, Wilson's trial counsel testified that they were "confus[ed]" about who was responsible for investigating Wilson's background. *Id.* at *12. Lead counsel O'Donnell testified that he told Carr and an investigator, William Thrasher, to "go out and investigate [Wilson's] background." *Id.* at *17. But Carr testified that he "was not involved in as much of the mitigation stage" because he believed O'Donnell was responsible for the investigation. *Id.* at *11. Thrasher testified that he was not "directed to conduct [an] investigation into . . . Wilson's life history for mitigating information." *Id.* at *12.

Wilson introduced evidence that the social services, school, and medical records in the possession of Wilson's trial counsel contained mitigating

8

information about Wilson's childhood homes and physical abuse by parental figures, as well as names of potential mitigation witnesses. *Id.* at *17–18. Trial counsel failed to explore any of the potential leads or witnesses found in the records. *Id.* at *17. Trial counsel testified that they were aware of the information in Wilson's records but made the strategic decision to focus on residual doubt instead of bringing in that evidence because it "would basically convince the jury that [Wilson] probably was the trigger man."

Wilson introduced 127 exhibits and nine witnesses that were either directly from or referenced in the records or that could have been discovered through investigation of references in the records. *Id.* at *26. Wilson introduced lay testimony from his former teachers, family members, friends, and social workers. *Id.* at *26–29. He also introduced expert testimony from neuropsychologist Dr. Jorge Herrera and from Dr. Kohanski. *Id.* at *30.

Wilson argued that the lay testimony could have been used to explain Wilson's disruptive childhood behavior and portray Wilson as someone who never stood a chance. Teachers testified that Wilson was a "tender and good" boy who "had a lot of potential" and "loved being hugged," and that if Wilson had "been afforded appropriate treatment, attention, guidance, supervision[,] and discipline in his early years, there is a good chance" he would not be on death row. Family members and friends testified that some of Wilson's childhood homes lacked

running water and electricity and were littered with containers full of urine. *Id.* at *26. They also testified that Cox's live-in boyfriends "slapp[ed]," "punch[ed]," and "once pulled a knife on" Wilson and that, for a period of a few months, Wilson and Cox lived with Cox's father, who beat Wilson with a belt. *Id.* at *29. Social workers testified that Wilson's young life included every "risk factor" they could think of, *id.* at *28, and that Wilson responded well to structure but his childhood was entirely unstructured, *id.* at *27–28.

Wilson argued that the expert testimony could have been used to explain Wilson's poor judgment skills and lack of impulse control. Dr. Herrera testified that his neuropsychological testing found that Wilson had "mild to severe impairments in brain function[], with severe impairment localized in the frontal lobes." *Id.* at *30. Dr. Herrera opined that "Wilson's association with Butts on the night of the murder and his failure to intervene are consistent with the concrete thinking and judgment problems associated" with Wilson's brain injuries. *Id.* Dr. Kohanski confirmed Dr. Herrera's assessment, *id.*, and testified that Dr. Herrera's testing should have been performed before Wilson's trial. Dr. Kohanski also testified that Wilson's frontal lobe injuries "indicate[] that [he] . . . is a highly suggestible individual, easily led by others in certain situations."

The superior court ruled that Wilson could not establish ineffective assistance of counsel because trial counsel's performance was not deficient and,

10

alternatively, that because Wilson suffered no prejudice. *Id.* at \*31. It explained that Wilson failed to establish prejudice because "the testimony proffered in support of this claim would have been inadmissible on evidentiary grounds, cumulative of other testimony, or otherwise would not have, in reasonable probability, changed the outcome of the [sentencing] trial." *Id.* Wilson filed an application for certificate of probable cause to appeal the denial of his petition, which the Supreme Court of Georgia summarily denied.

### C.  Wilson's Federal Petition for a Writ of Habeas Corpus

Wilson petitioned for a writ of habeas corpus in the district court, which denied him relief. The district court ruled that the decision of the superior court as to prejudice did not involve an unreasonable application of clearly established federal law and that the material findings of fact were reasonable. *Id.* at \*38; *see also* 28 U.S.C. § 2254(d). The district court granted Wilson a certificate of appealability on one issue: "Whether trial counsel was ineffective during the penalty phase by failing to conduct a reasonable investigation into mitigation evidence and by failing to make a reasonable presentation of mitigation evidence." *Id.* at \*57.

A panel of this Court affirmed. *Wilson v. Warden, Ga. Diagnostic Prison*, 774 F.3d 671, 681 (11th Cir. 2014), *vacated*, 834 F.3d 1227 (11th Cir. 2016) (en banc). We first concluded that "the one-line decision of the Supreme Court of

11

Georgia denying Wilson's certificate of probable cause is the relevant state-court decision for our review because it is the final decision 'on the merits,'" *id.* at 678 (quoting *Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008)), and declined to defer to the reasoning of the superior court, *id.* We then ruled that "[t]he Supreme Court of Georgia could have reasonably concluded that Wilson failed to establish that he was prejudiced." *Id.* at 679.

We later vacated the panel opinion and granted Wilson's petition for rehearing en banc. *Wilson v. Warden, Ga. Diagnostic Prison*, 834 F.3d 1227, 1242 (11th Cir. 2016) (en banc), *rev'd sub nom. Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188 (2018). We held that "when a federal court reviews a state prisoner's petition for a writ of habeas corpus," it "need not 'look through' a summary decision on the merits to review the reasoning of the lower state court." *Id.* at 1230.

The Supreme Court granted Wilson's petition for writ of certiorari and reversed and remanded. It held that when "the last state court to decide a prisoner's federal claim [does not] explain[] its decision on the merits" a federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. But, the Supreme Court held, a state "may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the

12

lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

Wilson filed a motion to remand or, alternatively, to expand the certificate of appealability and to permit supplemental briefing.

## II. STANDARD OF REVIEW

We review the denial of a habeas petition by a district court *de novo*. *Barnes v. Sec'y, Dep't of Corr.*, 888 F.3d 1148, 1155 (11th Cir. 2018). Under the Anti-Terrorism and Effective Death Penalty Act of 1996, we may grant "a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court" only when the adjudication of a federal constitutional claim "on the merits in State court proceedings" either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This narrow evaluation is highly deferential, for a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Morrow v. Warden*, 886 F.3d 1138, 1146–47 (11th Cir. 2018) (alteration adopted) (internal quotation marks

13

omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). The decision of a state court is "contrary to" federal law only if it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1355 (11th Cir. 2009) (citation and internal quotation marks omitted). The decision of a state court "involves an unreasonable application of federal law if it identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply." *Id.* (citation and internal quotation marks omitted). "The question . . . is not whether a federal court believes the state court's determination was correct but whether that determination was unreasonable—a substantially higher threshold." *Id.* (citation and internal quotation marks omitted).

We may not issue a certificate of appealability unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Jones v. Sec'y, Dep't of Corr.*, 607 F.3d 1346,

14

1349 (11th Cir. 2010) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003)). "Where, as here, the Antiterrorism and Effective Death Penalty Act . . . applies, we look to the [d]istrict [c]ourt's application of [the Act] to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason." *Id.* (alteration adopted) (quoting *Lott v. Att'y Gen., Fla.*, 594 F.3d 1296, 1301 (11th Cir. 2010)).

### III. DISCUSSION

As an initial matter, we deny Wilson's motion to remand or, alternatively, to expand the certificate of appealability and to permit supplemental briefing. Wilson has failed to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), with respect to his additional claims that his counsel were ineffective. And we resolve Wilson's appeal based on the original briefs filed by the parties. The district court evaluated the reasonableness of the reasons stated by the superior court when it denied Wilson's petition for a writ of habeas corpus, and the parties focused on those reasons in their original briefs to this Court.

Because the Supreme Court of Georgia did not explain its reasons for denying Wilson's state habeas petition, we must "look through" its decision and presume that it adopted the reasoning of the superior court, "the last related state-court decision that . . . provide[s] a relevant rationale." *Wilson*, 138 S. Ct. at 1192. "[T]he [s]tate may rebut the presumption by showing that the unexplained

15

affirmance relied or most likely did rely on different grounds . . . ." *Id.* Because we affirm the decision of the Supreme Court of Georgia based on the reasoning of the superior court, we need not address whether the state rebutted the presumption here.

Wilson argues that his trial counsel were ineffective because they failed to investigate his background and present mitigation evidence at his sentencing. To obtain relief, Wilson must establish both that his trial counsel's "performance was deficient, and that the deficiency prejudiced [his] defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Unless he establishes both requirements, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. And "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697.

To establish prejudice, Wilson had to prove "that [his] counsel's errors were so serious as to deprive [him] of a fair trial." *Id.* at 687. Wilson challenged his trial counsel's performance during the penalty phase of his trial, so he had to establish that "there is a reasonable probability that, absent the errors, the sentencer— including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. To decide whether there is a

16

reasonable probability of a different result, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweigh it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (alteration adopted) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

The superior court reasonably concluded that Wilson failed to establish prejudice. It discussed the mitigating and aggravating evidence that the sentencing jury heard as well as Wilson's new evidence and reasonably concluded that, even if the additional potential mitigating evidence had been admitted in Wilson's sentencing, "there is no reasonable probability that the outcome of the [sentencing] trial would have been different." The jury at Wilson's trial heard a large amount of graphic, aggravating evidence, and the superior court reasonably determined that a jury would have still sentenced Wilson to death even if it had heard Wilson's new evidence.

Indeed, our review of the record establishes that Wilson's new evidence would not have changed the overall mix of evidence at his trial because his new lay testimony presented a "double-edged sword." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (citation and quotation marks omitted). The teachers' testimony might have humanized Wilson, and other lay witnesses' testimony might have offered more detailed accounts of Wilson's home life. But

17

the teachers' mitigating testimony would have also revealed that Wilson was "disruptive" in school, and the social service workers' mitigating testimony would have added that one of the investigations into Wilson's home life was terminated prematurely because Wilson was incarcerated.

The lay witnesses' testimony would also have been undermined by other new evidence that "almost certainly would have come in with [the new lay testimony]." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009). Reports in Wilson's school records stated that Wilson had an "'I don't care' attitude," was physically and verbally aggressive to teachers and students, lacked self-control, and blamed others for his misconduct. A report from the Department of Family and Children Services recommended that Wilson remain in his mother's care, and a representative from the Department testified that the Department would "certainly not" have made that recommendation if the home had been unsafe or Wilson had been deprived of food or necessities. And the lay witnesses' testimony that Wilson was physically abused and neglected would have been undermined by the witnesses' uncertainty, Wilson's repeated denials that he was physically abused as a child, and school and medical records that described Wilson as "healthy," "clean," "well dressed," "well developed," and "well nourished."

Our review of the record also suggests that the new expert testimony would have failed to affect the overall mix of evidence at trial because Dr. Herrera's and

18

Dr. Kohanski's expert testimony was speculative and conflicted with other evidence. Dr. Herrera assessed Wilson using his own interpretive standards for the neuropsychological tests he administered on Wilson, instead of accepted, authoritative standards. Dr. Herrera testified that Wilson's test scores for attention, ability to focus, distractability, and impulsiveness were considered "normal" under the accepted, authoritative standards. Because Dr. Herrera did not recommend neurological imaging, his conclusion that Wilson had frontal lobe damage was based on only Dr. Herrera's unique interpretation of the tests. Dr. Kohanski's new conclusions were unreliable because they were based on Dr. Herrera's unreliable results. And Dr. Herrera's and Dr. Kohanski's expert testimony conflicted with other evidence. They testified that a person with Wilson's test results would be susceptible to suggestion and more of a follower than a leader. But other evidence established that Wilson had risen to the rank of "God damn chief enforcer" of the Milledgeville FOLKS gang and was the "clear leader of the group" during the incident at Georgia College.

The superior court reasonably concluded that Wilson's new evidence was "largely cumulative" of the evidence trial counsel presented to the jury. *See Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1260 (11th Cir. 2012)(opinion of Carnes, J.); *accord id.* at 1260–61. The evidence presented at trial and the new evidence "tell the same story," *id.* at 1267, of an unhealthy child who came from

19

an unstable home and received no parental supervision. The jury heard that, from the age of 9 or 10, Wilson lived on the streets in a difficult neighborhood. His father figures "came and went" and frequently used drugs. One such father figure held a gun to Wilson's mother's head in view of Wilson. Wilson struggled with his identity and joined a gang as a substitute for family. The jury also heard humanizing characteristics, such as Cox's plea to spare Wilson's life for the sake of his 18-month-old daughter, and that Wilson's biological father had no role in Wilson's life. And Dr. Kohanski testified that she would have liked to see images of Wilson's brain to confirm that he did not have a brain injury.

Indeed, the new evidence merely "tells a more detailed version of the same story told at trial." *Id.* at 1260. Wilson's new evidence revealed more details of his difficult background and included additional humanizing stories and speculation about brain damage. The only new revelation at Wilson's evidentiary hearing was that the men in Wilson's life abused him. Reasonable jurists could rule that this evidence was "largely cumulative" of the other evidence of Wilson's neglectful childhood. *Holsey*, 694 F.3d at 1260. We cannot say that the denial of Wilson's petition was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

20

## IV. CONCLUSION

We **AFFIRM** the denial of Wilson's petition for a writ of habeas corpus.

And we **DENY** Wilson's motion to remand or, alternatively, to expand the

certificate of appealability and to permit supplemental briefing.